UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10186-JLT |
| | ) | |
| HARRY GUZMAN | ) | |

DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION TO SUPPRESS: VIDEOTAPED SURVEILLANCE

Defendant Harry Guzman respectfully submits this memorandum in support of his motion to suppress videotaped surveillance of his person and of his residence at 197 West Street, Lawrence, Massachusetts conducted on June 1, 3, 4, 8, and 9, 2003 (and on all other dates when the surveillance was conducted), and all evidence seized, obtained or derived from that unlawful surveillance.  Among other grounds, defendant submits that the prolonged video surveillance trained on him and on his residence by law enforcement authorities violated his right to privacy in his residence and in the curtilage of his residence, and his right to be free from warrantless police intrusion.

Since the video and visual intrusions were unsupported by a warrant, the government has the burden of showing that the challenged police conduct was lawful.  See, e.g., United States v. Cruz Jimenez, 894 F.2d 1, 6 (1st Cir. 1990).

PRELIMINARY STATEMENT OF FACTS

Defendant lived and slept at his girlfriend's house at 197 West Street, Lawrence, Massachusetts.[1] On June 1, 3, 4, 8, and 9, 2003, and on diverse dates not yet disclosed,[2] the police conducted visual and videotaped surveillance of defendant and of 197 West Street. The videotaped surveillance occurred during the nighttime, involved use of low light lenses, and ran for six hours on June 3-4 (10:30pm to 4:37am) and for eight hours on June 8-9 (from 10pm to 6am). On June 8-9, 2003, the video surveillance included use of four video cameras scanning the front, side, and backyard of the 197 West Street house. The cameras recorded images on a property which was demarcated by a chain-link fence, with both a chain-link fence and bushes on the side perimeter, and a backyard which was considerably obstructed from public view.

---

[1] Defendant has standing to assert his right to privacy in the residence he shared with his girlfriend. This privacy protection has been interpreted to reach even to an overnight guest in a host's home. See Minnesota v. Olson, 495 U.S. 91, 96-98 (1990).

[2] According to the Affidavit of Sgt. Robert M. Irwin of the Massachusetts State Police, "[o]n or about late April early May 2003 this affiant and other officers were performing a surveillance of a subject known to us as Harry Guzman and the area of 197 West Street. Officers stationed in the area used both video and human surveillance of 197 West Street and Harry Guzman." Defense counsel have asked the government to provide discovery of all instances of video and visual surveillance, and the government has provided videotapes for surveillance performed on the dates cited above.

Among other things, the videos and/or surveillance revealed defendant talking with people, walking about the front, side and rear of the property, and engaging in sexual activity with his girlfriend.[3] The videos also recorded his movements on June 9, 2003, at the time of a nearby porch fire, as he appeared to leave his property, return some minutes later, and place an item in a trash area.

## ARGUMENT

### THE COURT SHOULD SUPPRESS THE VIDEO-RECORDINGS AS VIOLATIVE OF THE FOURTH AMENDMENT.

The Fourth Amendment guarantees that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Courts have protected persons against lawful governmental intrusions where the person had a subjective expectation of privacy that society would be willing to recognize as reasonable. Katz v. United States, 389 U.S. 347, 361 (1967).

In determining the reasonableness of a defendant's expectation, the courts commonly look at the character of the area under surveillance and the nature of that surveillance. See Kyllo v. United States, 533 U.S. 27, 34-36 (2001); Dow Chemical

---

[3] According to the Affidavit of Sgt. Irwin, supra at ¶ 3, on June 5, 2003 in the early morning hours, Guzman "went in to his car ... that was parked in the driveway of 197 West Street. He was joined by his girlfriend Soviera Alamo. She brought what appeared to be a blanket and Guzman and Alamo had what appeared to be sex."

Co. v. United States, 476 U.S. 227, 234-236 (1986); California v. Ciraolo, 476 U.S. 207, 213-215 (1986).  The area under surveillance here, a residence and its curtilage,[4] are generally considered to have "the most heightened" expectation of privacy. See Dow Chemical Co., 476 U.S. at 237 n.4.  This reflects "the over-riding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." Oliver v. United States, 466 U.S. 170, 183 (1983) (quoting Payton v. New York, 445 U.S. 573, 601 (1980)).

   The Supreme Court has held that the curtilage of the home, described as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,'" is part of the home for Fourth Amendment purposes. Oliver, 466 U.S. at 180 (quoting Boyd v. United States, 116 U.S. 616, 630 (1886)).  "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." California v. Ciraolo, 476 U.S. at 213.  This reflects the reality that people live in and around their houses, with

---

   [4] Curtilage is "an area of domestic use immediately surrounding a dwelling and usually but not always fenced in with the dwelling. [cite omitted]." United States v. Van Dyke, 643 F.2d 992, 993 n.1 (4th Cir. 1984).  As described in United States v. Oliver, 466 U.S. 170, 183 (1983), the curtilage is "the land immediately surrounding and associated with the home.  See 4 W. Blackstone, Commentaries *225."

personal interactions and daily routines occurring and intimate relationships revolve around the entire home place." United States v. Jenkins, 124 F.3d 768, 772 (6th Cir. 1997) (holding the district court erred in refusing to suppress items seized from the backyard but affirming convictions because the vast amounts of incriminating evidence made the error harmless).

In United States v. Cuevas-Sanchez, 821 F.2d 248 (5th Cir. 1985), the police suspected that the defendant's home was being used in a drug trafficking scheme and sought an order from the district court allowing video surveillance of the exterior of his house. Id. at 249-250. The affidavit in support of that application included, inter alia, testimony from police regarding the basis for their suspicions, statements from a confidential informant and an explanation that less intrusive techniques had or would likely fail. Id. at 249. The court granted their application with the provisions that the surveillance last for no more than thirty days and that surveillance cease when the suspects were not present and during innocent conduct. Id. The police then placed a video camera on a public telephone pole abutting Cuevas' backyard, which they believed was a locus for trafficking activity. Id. at 250. The property was surrounded by a tall fence on one side, an approximately five foot fence on another and a chain-link fence on yet another side. Id. The captured images encompassed the yard and outside of the house,

including an area for car parking.  Id.  The defendant sought suppression of the surveillance arguing that "the government's application for the surveillance order did not conform to [...] constitutional standards...."  Id.  In response, the government argued that the surveillance did not even constitute a "search" for the purposes of the Fourth Amendment, as significant portions of the yard were visible from the street, a man of average height could see over the shorter fence, and any telephone maintenance worker could have place the camera on the pole as the police did. Id.

The court rejected the government's arguments and found that the video surveillance was indeed a search.  In making this determination, the court distinguished prolonged video surveillance, the "most intrusive method of surveillance," from less intrusive observations that may fall under the plain-view doctrine.  Id.  The court stated:

> To measure the government's intrusion we must consider the expectations of society.  Ciraolo teaches us that a fly-over by a plane at 1,000 feet does not intrude upon the daily existence of most people....

Id. at 251 (footnotes omitted).  But the Fifth Circuit held that video surveillance was wholly distinguishable from such passing observation, because:

> [Video surveillance] provokes an immediate negative visceral reaction: indiscriminate video surveillance

>     raises the spectre of the Orwellian state.[5] [...]
>     [U]nlike in Ciraolo, the government's intrusion is not
>     minimal.  It is not a one-time overhead flight or a
>     glance over the fence by a passer-by.  Here the
>     government placed a video camera that allowed them to
>     record all activity in Cuevas's backyard.  It does not
>     follow that Ciraolo authorizes any type of surveillance
>     whatever just because one type of minimally-intrusive
>     aerial observation is possible.

Id.

In Cuevas-Sanchez, the video surveillance was ultimately admissible, notwithstanding its intrusive nature, because the government had "followed the proper procedure," i.e., had obtained a warrant.  Here, there was no warrant.  The Lawrence Police conducted surveillance, including video surveillance, on numerous occasions, including on June 1, 3, 4, 8, and 9, 2003, and for prolonged periods, six hours and longer.  There was no indication of police monitoring, and no indication that police had secret surveillance video at or near the front and rear of the property and were using low light lenses to capture images which were unavailable to the naked eye.  The police use of artificial amplification of the images resulted in a deeper penetration into the nighttime darkness and sharper images than were otherwise possible.  Certainly, to the side and rear of the

---

[5]The analogy to the Orwellian state, as Circuit Judge Posner has explained, evokes the imagery of "'Oceania,' the miserable country depicted in" George Orwell's 1984, throughout which "Big Brother" uses "telescreens" to maintain continuous "visual surveillance of the entire population."  United States v. Torres, 751 F.2d 875, 877 (7th Cir. 1984).

property, which were demarcated by chain-linked fencing, bushes and darkness, there was every reason to expect privacy and none to expect the intrusion of police surveillance. Cuevas-Sanchez, 821 F.2d at 250-251; see also United States v. Nerber, 222 F.3d 597 (9th Cir. 2000) (affirming the suppression of non-consensual video surveillance conducted in a private hotel room over a three hour period).

Indeed, in Cuevas-Sanchez, the court required the warrant application to satisfy the high standard for intensive surveillance, namely that it comport with four, non-technical provisions of Title III. 821 F.2d at 252. Those were:

> (1) the judge issuing the warrant must find that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[;]' (2) the warrant must contain 'a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates[;]' (3) the warrant must not allow the period of interception to be 'longer than is necessary to achieve the objective of the authorization, [ ] or in any event longer than thirty days' (though extensions are possible)[;] and (4) the warrant must require that the interception 'be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under [Title III].'

Id. (citing United States v. Biasucci, 786 F.2d 504, 510 (2nd Cir. 1986) (internal citations omitted)). It was because the warrant application submitted to the district court had met these four requirements that the court affirmed the conviction. Cuevas-Sanchez, 821 F.2d at 251.

Significantly, Cuevas-Sanchez was cited with approval by the First Circuit in Vega-Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 191 (1st Cir. 1997), which noted that "concealed cameras which infringe upon the rights of criminal defendants raise troubling constitutional concerns." There, the court held that employees of a quasi-public telephone, notified of the videotaping by the employer, had no legitimate expectation to be free from videotaping in an open and undifferentiated work area, but nonetheless emphasized that "the precise extent of an expectation of privacy often turns on the nature of an intended intrusion." Id. at 180.

Several other circuits have addressed the constitutional requirements under the Fourth Amendment in the specific context of video surveillance, and similarly concluded that in such cases heightened judicial protection is necessary. In United States v. Torres, the court discussed the constitutionality of video surveillance in private spaces and concluded that a "search could be unreasonable, though conducted pursuant to an otherwise valid warrant, by intruding on personal privacy to an extent disproportionate to the likely benefits from obtaining fuller compliance with the law." 751 F.2d at 883. In United States v. Mesa-Rincon, 911 F.2d 1433, 1441 (10th Cir. 1990), the court found, in the context of a request for a warrant to conduct video surveillance of a business premises, that the government had

demonstrated a pressing need for a warrant despite the "high degree of intrusiveness" of videotaping, but stated that "We leave to another day the details of the higher showing that would *a fortiori* be required to justify video surveillance of the central bastion of privacy -- the home." See also United States v. Koyomejian, 970 F.2d 536, 542 (9th Cir. 1992); United States v. Falls, 34 F.3d 674, 680 (8th Cir. 1994); United States v. Williams, 124 F.3d 411, 416 (3rd Cir. 1997); Application for Order Authorizing Interception of Oral Communications & Videotape Surveillance, 513 F.Supp. 421, 422 (D.Mass. 1980) (combination of videotape and audio surveillance described as "extraordinarily intrusive"); United States v. Taketa, 923 F.2d 665, 677 (9th Cir. 1991) (finding that a "silent, unblinking lens of the camera was intrusive in a way that no temporary search" could have been).[6]

As one scholarly observer recently concluded in his discussion of the current constitutional limits on video surveillance:

> While government need not adhere to the Fourth Amendment warrant requirements to install cameras that monitor a public place, it must fully comply with them if the cameras are to be pointed at a nonpublic place. For that practice to comport with constitutional

---

[6] We note that, in this line of cases, the courts found that the Fourth Amendment was implicated and that the Title III requirements were made constitutionally necessary by the prolonged, secretive nature of video surveillance despite the fact that the spaces at issue were non-residential, where lower standards of protection are generally necessary. See, e.g., Maryland v. Macon, 472 U.S. 463 (1985).

> standards, no camera should ever be aimed at any
> private dwelling, or at any residential curtilage or
> backyard, unless specifically authorized by a judge.
> While the aerial exposure of the home or curtilage may
> allow warrantless surveillance from a plane, it does
> not further justify warrantless video surveillance
> because it poses a far more serious threat to the
> privacy interests in the home.

Max Guirguis, <u>Electronic Visual Surveillance and the Reasonable Expectation of Privacy</u>, 9 J. Tech. L. & Pol'y 143, 174 (2004) (footnotes omitted).  In the view of a second commentator, assessing <u>Cuevas-Sanchez</u> and the six other courts that have accepted its analysis and remedy, video surveillance is a hyper-intrusive search "qualitatively different from most other searches."  Ric Simmons, <u>Symposium: The Power and Pitfalls of Technology: Technology-Enhanced Surveillance by Law Enforcement Officials</u>, 60 N.Y.U. Ann. Surv. Am. L. 711, 726 (2005).  "[I]n effect the Title III requirements have become 'constitutionalized'[] for video surveillance" in order to ameliorate the potentially oppressive effects of ongoing surveillance of one's private property.  <u>Id</u>.

   Here, the police undertook a broad ranging, sustained, enhanced, and unsuspected videotaped surveillance of defendant at his home, all without a warrant.  The surveillance was conducted with a low light lens, capturing images which could not be seen by a casual passerby.  Defendant, invoking case law supporting the necessity of a warrant for police use of videotape surveillance of a home and its curtilage, and there being no

-11-

warrant here, seeks suppression of the surveillance and its fruits.  <u>Mesa-Ricon</u>, 911 F.2d at 1445.

CONCLUSION

For the reasons discussed above, defendant respectfully requests that the motion to suppress the surveillance and its fruits be granted.

HARRY GUZMAN
By his attorneys,
David A Ruhnke, Esq.
Carl N. Donaldson, Esq.
Charles P. McGinty


/s/ Charles McGinty
Charles P. McGinty
   B.B.O. #333480
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061
