UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
        v.                      )    CRIMINAL NO. 04-10186-JLT
                                )
HARRY GUZMAN                    )

DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION TO SUPPRESS STATEMENTS

Defendant, Harry Guzman, respectfully submits this memorandum in support of his Motion to Suppress Statements allegedly made on June 9, 2003 and November 12, 2003.

Defendant reserves the right to amend or supplement this memorandum in response to the government's reply and to the extent that additional discovery and investigation make necessary.

PRELIMINARY STATEMENT OF FACTS[1]

On April 3, 2003, a fire destroyed a building at 48-50 Manchester Street in Lawrence. Two persons, a mother and her child, died in the fire. In the days following the fire, a task force of law enforcement agencies was assembled, including the Massachusetts State Police and the Bureau of Alcohol, Tobacco and Firearms (ATF). ATF agent Konstantinos Balos and State Trooper

---

[1]This preliminary statement includes some law enforcement contentions taken from police reports. Defendant reserves the right to amend this statement if the evidence from an evidentiary hearing so dictates.

Matthew Gravini became actively involved in the investigation in April 2003.

On June 9, 2003, shortly after 4:00 a.m., Guzman was arrested for allegedly setting a fire on an exterior porch at a property located at 34 Washington Street, Lawrence, MA.  He was transported to the Lawrence Police Department.

While in custody, Guzman was told that he had the right to an attorney.  According to the police report, Guzman "stated that he wished to make a telephone call to his attorney...."  Report of Tpr. Matthew Gravini, Massachusetts State Police, undated, Bates stamped HG007.  Notwithstanding Guzman's request to contact his attorney, police began to question him about the April 3, 2003 fatal fire.  According to Trooper Gravini's report, Guzman made statements regarding the fire, telling officers that an individual named "Juan" had admitted setting the fire and had described how it had been ignited.

Guzman was held pending his appearance in Lawrence District Court.  He retained counsel, Carl Donaldson, Esq., who continues to represent Guzman to the present.

Guzman was charged in state court with arson in connection with the June 9, 2003 fire.  In July, following several days of hearings, he was released from custody.  He was later returned to custody because of a violation of bail conditions, and was

-2-

incarcerated in November 2003 at the Essex County House of Corrections at Middleton ("Middleton Jail").

On November 12, 2003, ATF agents Balos and Thomas Wlodyka entered the Middleton Jail to re-interrogate Guzman. The agents knew that Guzman was represented by counsel, but did not notify him of their jail visit. At the start they told Guzman that they were not asking him to waive his rights, but wanted him to listen to what they had to say. They asked him to sign an acknowledgment of his rights, but did not ask him to waive his rights and did not ask him to sign the waiver portion of the form. Guzman told the agents he wanted his attorney present; the agents replied that he did not need an attorney since they were not going to ask any questions and that they just wanted him to listen to what they had to say. See Affidavit of Harry Guzman, attached as Exhibit A.

They began talking about the fatal fire on Manchester Street. They showed him photos of the burned bodies, including of the baby, ordering him to "look," and telling him: "These people need justice." The agents told him that, because of their investigation, they already "knew" he was involved in the fatal fire and that now was the time for him to tell them what he knew and what he had done since later it would be too late for them to help him. Guzman told the agents he did not do the fatal fire and again asked for his attorney to be present before things went

-3-

any further since it looked like they were accusing him of murder.  Agent Balos told him that he was under investigation for the fatal fire by a federal grand jury.  Guzman again asked for his lawyer and told the agents he did not want to answer any questions without his lawyer.  Agent Balos replied that there is no need for his lawyer to be present.  Guzman yielded to the agents, believing he had no choice.

As the agents were leaving the jail, the agents asked him to sign a form which they could show their boss that they had met with him.  He signed the form without reading what he was signing.  It appears to have been the waiver part of the Miranda form.

<u>ARGUMENT</u>

I.   DEFENDANT INVOKED HIS RIGHT TO COUNSEL BEFORE BEING
     INTERROGATED ON JUNE 9, 2003, RENDERING HIS ALLEGED
     <u>STATEMENT TO LAW ENFORCEMENT INADMISSIBLE</u>

The Fifth Amendment right to counsel attaches when a suspect invokes the right to counsel during custodial interrogation.  "Invocation of the <u>Miranda</u> right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'"  <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994) (<u>quoting</u> <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991)).  As the <u>Davis</u> Court stated, a suspect need not "speak with the discrimination of an Oxford don," <u>id</u>. at 459 (internal quotations omitted); he need only articulate his desire to have counsel present "sufficiently

-4-

clearly that a reasonable police officer in the circumstances
would understand the statement to be a request for an attorney."
Id.  Here, Guzman was brought in custody to the Lawrence Police
station, and was held awaiting the arrival of Trooper Gravini,
the principal interrogator.  He asked to contact his attorney.
This request is confirmed in Trooper Gravini's report, that
Guzman had "stated that he wished to make a telephone call to his
attorney prior to my arrival."  As in the cases discussed below,
Guzman's request to call his attorney invoked his right to
counsel.

     In United States v. Green, 272 F.3d 748, 750 (5th Cir.
2001), the court held that defendant had invoked his right to
counsel when he "asked to contact his lawyer."  In Smith v.
Illinois, 469 U.S. 91, 97 (1984), the Supreme Court held that a
suspect's statement, "Uh, yeah, I'd like to do that," upon
hearing of his right to counsel, was a clear invocation of the
right to counsel.  In Robinson v. Borg, 918 F.2d 1387, 1389 (9th
Cir. 1990), the statement "I have to get me a good lawyer, man.
Can I make a phone call?" was ruled a clear invocation of the
right to counsel.  In United States v. Taft, 769 F.Supp. 1295
(D.Vt. 1991), the court found "[defendant's] statement, 'Yeah,
let's do that. Well, when we get down to the office, can we call
-- use your phone to call an attorney?' [could] only [have been]
understood as expressing a desire to obtain counsel before
continuing with any interrogation."  Id. at 1303.  In United

-5-

States v. de la Jara, 973 F.2d 746, 750 (9th Cir. 1992), the question "can I call my attorney?" or "I should call my lawyer" was also held to be a clear invocation of the right to counsel.

Thus, as the trooper's report makes plain, defendant clearly invoked his right to counsel when he said he wished to make a phone call to his attorney. Defendant's own affidavit adds more detail, but the trooper's report in and of itself demonstrates that there is no factual issue here; Mr. Guzman clearly invoked his Fifth Amendment right to counsel on June 9, 2003.

Having invoked his right to counsel, defendant should not have been questioned. United States v. Ortiz, 177 F.3d 108 (1st Cir. 1999). Under Davis, "a suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present." 512 U.S. at 458 [cites omitted]. This rule is "'designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights.'" Id. (quoting Michigan v. Harvey, 494 U.S. 344, 350 (1990)).

Once invoked, the right to counsel endures even if the suspect has consulted with an attorney. "[T]he requirement that counsel be 'made available' to the accused refers to more than an opportunity to consult with an attorney outside the interrogation room." Minnick v. Mississippi, 498 U.S. 146, 152 (1990). As the Court unequivocally held: "...when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused

-6-

has consulted with his attorney." <u>Id</u>. at 153.  Any statements

obtained by interrogation initiated by the police in the absence

of counsel are inadmissible.  <u>Edwards v. Arizona</u>, 451 U.S. 477,

484 (1981); <u>United States v. Ortiz</u>, 177 F.3d at 110.  The

government may not question the suspect in the absence of counsel

at this point because "[counsel's] presence would insure that

statements made in the government-established atmosphere are not

the product of compulsion."  <u>Minnick</u>, 498 U.S. at 152 (quoting

<u>Miranda v. Arizona</u>, 384 U.S. 436, 466 (1966)).

 For these reasons, defendant's alleged statements to police

on June 9, 2003, must be suppressed.

## II. DEFENDANT'S ALLEGED STATEMENT TO AGENTS ON NOVEMBER 12, 2003 MUST BE SUPPRESSED

### a. The Agents Unlawfully Re-initiated Interrogation in Violation of Davis

 Since defendant had invoked his right to counsel on June 9,

2003, police could not at a later time reinitiate the

questioning.  Under the rule of <u>Davis</u>, "a suspect who has invoked

the right to counsel cannot be questioned regarding any offense

unless an attorney is actually present."  512 U.S. at 458 [cites

and internal quotations omitted].  In <u>Arizona v. Roberson</u>, 486

U.S. 675 (1988), a suspect was arrested for burglary and invoked

his right to counsel.  Three days later, while in custody, police

warned him again, questioned him about a second burglary and

obtained incriminating statements.  <u>Id</u>. at 678.  The Court

stated:  "As a matter of law, the presumption raised by a

suspect's request for counsel -- that he considers himself unable
to deal with the pressures of custodial interrogation without
legal assistance -- does not disappear simply because the police
have approached the suspect, still in custody, still without
counsel, about a separate investigation." Id. at 683.
Similarly, in Minnick, 498 U.S. at 153, the defendant had invoked
his right to counsel during a custodial interrogation by FBI
agents.  After defendant met with an appointed lawyer, the agents
again went to the jail to interrogate him.  The Court ruled that
"...officials may not reinitiate interrogation without counsel
present, whether or not the accused has consulted with his
attorney." Id. at 153.  The Court reasoned that "[a] single
consultation with an attorney does not remove the suspect from
persistent attempts by officials to persuade him to waive his
rights, or from the coercive pressures that accompany custody and
that may increase as custody is prolonged." Id.

Despite the prohibition against re-instituting
interrogation, on November 12, 2003, ATF Agent Konstantinos Balos
along with another agent went to the Middleton Jail to re-
interrogate Guzman on the same subject raised at the prior
interrogation on June 9, 2003, namely the fatal fire on April 3,
2003.[2]  Agent Balos knew that Guzman was represented by counsel,

---

[2]The November 12 interrogation was "custodial" for the purposes
of Miranda.  Miranda v. Arizona, 384 U.S. 436, 444-45 (1966)
(defendants had undergone "custodial interrogations" where "[i]n
each, the defendant was questioned by police officers, detectives

the same attorney Guzman had retained following his arrest and interrogation on June 9, 2003, Carl Donaldson, Esq.

The re-interrogation of Guzman violated the rule of <u>Edwards</u> and <u>Davis</u>.  Guzman's request for counsel -- whereby he made clear that he considered himself unable to deal with the pressures of custodial interrogation without legal assistance -- did not disappear as he sat in custody awaiting trial.  Where he had invoked his right to have counsel mediate between himself and the police, the agents were not free to reapproach him for questioning.

Importantly, Guzman, in the November re-interrogation, was in precisely the same situation he had been in when first arrested in June, namely in custody facing interrogation regarding the fatal fire.[3]  The same coercive effects of custody,

_____

or a prosecuting attorney in a room in which he was cut off from the outside world").  The ATF's interrogation of Guzman is similar to the custodial interrogation in <u>Mathis v. United States</u>, 391 U.S. 1 (1968), where defendant was incarcerated for an unrelated state offense.  <u>Id</u>. at 4-5 ("We find nothing in the <u>Miranda</u> opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody").

[3]It is immaterial that Guzman's custody had not been continuous from June 9 to the November 12 re-interrogation, since the coercive effects of custody were the same in both circumstances.  Some courts differ, following the lead of <u>United States v. Skinner,</u> 667 F.2d 1306 (9th Cir. 1982), to suggest that the rule of <u>Edwards</u> -- precluding police initiation of further interrogation once a suspect requests an attorney -- does not apply to suspects not in continuous custody.  The First Circuit has not ruled on the issue.  Moreover, in <u>Skinner</u>, defendant was not in custody at the time of his invocation of his right to counsel, rendering the <u>Miranda</u> analysis entirely inapplicable.

that Guzman was alone in the presence of law enforcement agents
who pressed for admissions to make a capital case, remained.  The
agents, who had chosen not to approach Guzman while he was on
release since they had no means (except arrest) to compel him to
submit to an interrogation, seized upon Guzman's remand to re-
approach him in a custodial setting, where he would not be free
to walk from their presence or rebuff them.  Anticipating that
Guzman would ask for his attorney, as he did, the agents devised
a way to get the re-interrogation going, telling him that they
were not questioning him and asking him just to listen to what
they had to say (as if they had something to offer him, except an
opportunity to inculpate himself).  The rule of Edwards, which
"was designed to prevent police from badgering a defendant into
waiving his previously asserted Miranda rights," Davis, supra,
forbids such manipulation of a suspect's right to the
intercession of counsel.  That the agents re-approached Guzman
fully aware that he was represented by counsel and plainly
seeking to circumvent that representation, introduces an extra
measure of bad faith.

---

The same is true of McFadden v. Garraghty, 820 F.2d 654 (4th Cir.
1987), where defendant, a police officer, was questioned by a
"personal friend" who drove him home following questioning, and
of United States v. Geitmann, 733 F.2d 1419 (10th Cir. 1984),
where the later statement was made when defendant was free on
bond.  In each of these cases, only one of the interrogations was
custodial.  In contrast, the coercive circumstances when Guzman
invoked his right to counsel in June were replicated in the
November re-interrogation.

For these reasons, the statement of November 12 must be suppressed.

>    b.    Defendant Expressly Maintained His Invocation of
>           the Right to Counsel, Rendering Inadmissible His
>           Subsequent Statements to Law Enforcement

While being questioned on November 12, 2003 by ATF agents, Guzman requested counsel at least twice. <u>See</u> Guzman Affidavit at ¶¶ 5-6. He did so at the inception of the re-interrogation, and, again, as the agents told him that he was under investigation for the fatal fire by a federal grand jury. Each invocation was clear and, independently from the argument above, required the agents to halt the interrogation. In each instance, the agents pressed forward in pursuit of incrimination, in plain violation of the rule of <u>Davis</u>: "[a] suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present." 512 U.S. at 458 [internal citations omitted]. Therefore, Guzman's statements to the ATF are inadmissible.

Rather than honoring the request for counsel, the agents sought to dissuade Guzman from his invocation. They told him that he "wasn't under arrest;" that "we're just asking you questions;" and that "there's no need for him (lawyer) to be here." Here, as in other cases, misrepresentations or false information given by the police are sufficiently coercive to invalidate any alleged waiver by Guzman of his Fifth Amendment privilege.

In Collazo v. Estelle, 940 F.2d 411, 414, 417-18 (9th Cir. 1990), the court found that, following a suspect's request to talk to a lawyer, police statements, such as this is the "last chance to talk to us" and it "might be worse for you" to talk to an attorney, rendered his Miranda waiver involuntary.  "As if this were not enough, [the officer] inappropriately led [the defendant] to believe he would reap some legal benefit by excluding defense attorneys from the pre-trial process. Such a tactic is inconsistent with Miranda's stated purpose...." Id. at 418.

In Hart v. Attorney General of Florida, 323 F.3d 884 (11th Cir. 2003), defendant signed a Miranda waiver and then agreed to speak about a murder with a detective whom he knew from his neighborhood.  The detective told him that being honest with the police "wouldn't hurt him," a statement incompatible with the phrase "anything you say can be used against you in court." Id. at 894.  The detective also said that having a lawyer present to prevent defendant from answering incriminating questions was a disadvantage.  Consequently, defendant, without an attorney, provided an incriminating statement.  The appeals court found that the defendant's decision to waive his rights and confess was not voluntary, knowing, and intelligent because that decision was based on misleading and false information.

Similarly, in United States v. Anderson, 929 F.2d 96, 97-100 (2nd Cir. 1991), the court found that the law enforcement

officers' false and misleading statements, which included "this
[is] the time to talk to us, because once you tell us you want an
attorney we're not able to talk to you and as far as I [am]
concerned, we probably would not go to the U.S. Attorney or
anyone else to tell them how much [you] cooperated with us,"
effectively undermined the purpose of the Miranda warnings.  Id.
at 97.

Here, defendant, after having repeatedly requested counsel,
was given false and misleading information by the ATF agents
which undermined the purpose of the Miranda warnings and
interfered with his exercise of his right to counsel.  For each
of these additional reasons, his statement should be suppressed.

    c.   The Interrogating Agents Deliberately Delayed
         Seeking Defendant's Waiver of His Miranda Rights.

Agent Balos, in his account of the re-interrogation, stated
that he began the November 12 re-interrogation by asking the
defendant "if he would listen to what the agents had to say."
ATF Report of Investigation.  The agents' report described the
interaction as follows:

> At the beginning of the interview, Guzman was explained
> his Miranda rights and told that he would not be
> questioned regarding his charged offense.  After Guzman
> stated that he understood his rights, he signed the
> section of the Miranda rights form indicating that he
> understood his rights (approx. 11:15 a.m.).  Guzman was
> subsequently told that the purpose of the visit was to
> discuss the fatal fire on Manchester Street and asked
> if he would listen to what the agents had to say.  At
> approximately 12:15 p.m., Guzman expressed that he
> wanted to talk with ATF agents Balos and Wlodyka about
> the fatal fire.  At the conclusion of the interview,

-13-

> Guzman agreed to sign the waiver portion of his
> statement of rights and reflect the 12:15 time when he
> verbally waived his rights.

Id. As is apparent from the agent's report, the agents

deliberately deferred obtaining a waiver of Miranda rights.  The

Miranda form presented to Mr. Guzman contained two parts

requiring two signatures:  the first lists the Miranda rights

followed by a signature line for a suspect to affirm that he

"understand[s] what my rights are;" the second states that the

suspect is waiving his Miranda rights and is agreeing to speak

with the agents, and is also followed by a signature line.

Mr. Guzman was asked to sign the first line, acknowledging his

rights, which he signed, according to the form and the agents'

report, at 11:15 a.m.  The agents did not then seek, nor did they

obtain, his waiver.  Only at the conclusion of the interrogation

-- too late -- did the agents secure his signature to the waiver

section, which contained an express waiver of rights.[4]

Miranda requires both an acknowledgment of rights and an

express waiver of those rights before custodial statements may be

admitted in court.  384 U.S. at 479.  As the Miranda Court

commanded:

> An express statement that the individual is willing to
> make a statement and does not want an attorney followed
> closely by a statement could constitute a waiver.  But

---

[4] The agents claimed in the report that defendant had
"verbally" waived his rights earlier, one hour into the
interview, but they apparently did not think it opportune to
document the alleged waiver at that time.

-14-

> a valid waiver will not be presumed <u>simply from the</u>
> <u>silence of the accused after warnings are given</u> or
> simply from the fact that a confession was in fact
> eventually obtained.

<u>Id</u>. at 475 (emphasis added).  Indeed, as stated in <u>Arizona v.</u>

<u>Roberson</u>:

> if a suspect believes that he is not capable of
> undergoing such questioning without advice of counsel,
> then it is presumed that any subsequent waiver that has
> come at the authorities' behest, and not at the
> suspect's own instigation, is itself the product of the
> inherently compelling pressures and not the purely
> voluntary choice of the suspect.

486 U.S. at 681.

It is conspicuous that the agents sought no waiver at the

beginning of the re-interrogation.  The reason, too, is

conspicuous:  they anticipated that Guzman would invoke his right

to counsel (as he had on June 9, 2003 and as he did again here).

So they devised a way to get an exchange going with Guzman by

asking "if he would listen to what the agents had to say."  One

pauses:  what on earth could the agents have said, if they were

candid with him, except that they were sizing him up for a

capital charge?[5]  By the false suggestion that "listen[ing]" to

the agents could somehow prove beneficial, the agents sought to

get Guzman talking and gradually coax, cajole and prod him into

incriminating himself.  This tactic, to get a suspect talking and

---

[5] Even if the subject of the re-interrogation was possible
cooperation, the agents were not free to proceed in the absence
of a waiver.  <u>See</u> <u>United States v. Ortiz</u>, 177 F.3d 108 (1st Cir.
1999).

secure his waiver later, is a variant on the Missouri "two-step" -- or the "question-first tactic" -- recently rejected by the Supreme Court in <u>United States v. Seibert</u>, 542 U.S. 600, 124 S.Ct. 2401 (2004).[6]

In <u>Seibert</u>, the defendant was arrested on suspicion of participating an arson of her home that killed one child and burned the body of her recently deceased son. After arresting the defendant, the interrogating officers agreed between themselves not to administer <u>Miranda</u> warnings immediately, and instead seated her in an interrogation room and interrogated her for 30-40 minutes. During this first round of questioning, the defendant confessed to her role in the arson. After a 20-minute coffee break, the officers administered <u>Miranda</u> warnings, received a waiver, and by referring her back to her earlier statements, induced her to repeat her confession of guilt. <u>Id</u>. In ruling the statement inadmissible, the Court noted that "<u>Miranda</u> condition[s] the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give [] warnings <u>and obtain a waiver of rights</u> before custodial questioning generally requires exclusion of any statement obtained." <u>Id</u>. at 2608 (emphasis added).

As in <u>Seibert</u>, the interrogation technique of the two ATF agents belies an unmistakable program to circumvent <u>Miranda</u>. No

---

[6]<u>Seibert</u> was decided approximately seven months after this interrogation.

other reasonable explanation exists for why the agents, presumably quite familiar with <u>Miranda</u>'s requirement that there be both a warning <u>and</u> a waiver of rights, would separate the warnings and the waiver.  The motive for this tactic, plainly, was to persuade Guzman to abandon his invocation of the right to counsel.  The escalating level of investigative prodding and badgering which followed is additional evidence of a design to engage in an un-<u>Mirandized</u> interrogation of Mr. Guzman and to subvert <u>Miranda</u>.  Moreover, and of great significance, Agents Balos and Wlodyka expressly counseled Mr. Guzman that he did not need an attorney present, a misleading statement that further invalidated the agents' later request for a waiver.

The "question-first" interrogation method is only one of many such law-enforcement techniques which aim to circumvent the protections of <u>Miranda</u>.  At the heart of the Supreme Court's renunciation of such tactics is the recognition that they negate the imperative that a <u>Miranda</u> "waiver [be] made voluntarily, knowingly and intelligently."  <u>Miranda</u>, 384 U.S. at 444. Recognizing this flaw in "question-first," the <u>Seibert</u> Court noted, "After all, the reason that [the tactic] is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the onset[.]"  <u>Seibert</u>, 542 U.S. at 610-11.  Whether the tactic is "question-first, waive later" (á la <u>Seibert</u> and here), or the decent-Christian-burial speech from the front seat of a police

-17-

cruiser (á la <u>Williams</u>),[7] all such interrogative tactics are manipulative efforts to induce a defendant to abandon his right not to submit to questioning and to override the defendant's ability to make a knowing, intelligent and voluntary decision to retain his rights.  All are impermissible violations of a defendant's right to counsel.

This case presents a calculated attempt by federal law-enforcement agents to elude the mandates of <u>Miranda</u> and thereby deny Mr. Guzman the opportunity knowingly and intelligently to retain or waive his rights.  This is precisely the breed of misconduct the <u>Seibert</u> Court intended to redress.  All statements made by Mr. Guzman on November 12, 2003 must be suppressed.

> d. The Re-interrogation of Defendant, Occurring when He Was Represented by Counsel, Violated Mass. Rules of Professional Conduct 4.2.

At the time of the November 12 re-interrogation of Guzman, ATF Agent Balos knew that Guzman was represented by counsel, Carl Donaldson, Esq., and that Guzman had hired Donaldson in the aftermath of his arrest and interrogation on June 9, 2003.  Balos

---

[7]In <u>Brewer v. Williams</u>, 430 U.S. 387 (1977), the defendant had surrendered to police in connection with the disappearance of a young child, whose body the police believed to be nearby. Knowing he had invoked his right to counsel, the officers who were transporting the defendant in the rear of their car began to discuss, in an attempt to play on his religious tendencies, how important it was the girl receive a Christian burial.  Their statements induced the defendant to confess the location of the body.  The Supreme Court held that the officer's suggestive statements were clearly meant to elicit incriminating statements and were "tantamount to interrogation," in violation of the Sixth Amendment.  <u>Id</u>. at 399 n.6, 400.

presumably anticipated that Donaldson would not consent to a re-interrogation of his client, so he did not seek his consent before going to the Jail.  During the re-interrogation, agent Balos disclosed to Guzman that a federal grand jury had convened in his case, making plain that the Office of the United States Attorney was then actively involved in the investigation of the fatal fire.[8]

It would be reasonable to expect, where Guzman was targeted for federal capital prosecution, that the agents would have sought legal guidance, either within ATF or from the United States Attorney's Office, prior to re-approaching Guzman.

Mass. Rules of Professional Conduct 4.2 prohibits contact with represented persons.  The Rule states:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Id. By local rule, attorneys practicing in the United States District Court for the District of Massachusetts must adhere to the ethical rules adopted by the SJC, unless a specific exception obtains.  See D. Mass. R. 83.6(4)(B); Stern v. United States District Court, 214 F.3d 4, 7 (1st Cir. 2000).  The rule is

---

[8]Moreover, one or more law enforcement officers investigating the fatal fire were actively involved in another federal investigation, also under the supervision of the United States Attorney, and were using that investigation as an opportunity to develop evidence in the present case.

applicable to federal prosecutors.  See In re Criminal Investigation of John Doe, Inc., 194 F.R.D. 375 (D. Mass. 2000); United States v. Jamil, 707 F.2d 638, 645 (2nd Cir. 1983); United States v. Hammad, 858 F.2d 834, 838 (2nd Cir. 1988); United States v. Lopez, 4 F.3d 1455, 1459 (9th Cir. 1993).  It may similarly be applicable to law enforcement officers when they act as the alter ego of government prosecutors.  United States v. Jamil, supra.  Government agents act as the alter-ego of the government prosecutors when the latter are 'privy' to the conduct of the agents.  Id. at 646.[9]

Indeed, there is authority supporting application of the rule to investigators acting on behalf of lawyers, even without a showing of knowledge by the attorney.  See United States v. McDonnell Douglas Corp., 132 F.3d 1252 (8th Cir. 1998) (prohibiting DOJ's "investigative agents" from contacting current and former employees of corporation); Upjohn Co. v. Aetna

---

[9]The rule provides an exception for "constitutionally permissible investigative activities of lawyers representing governmental entities, directly or through investigative agents...."  Rule 4.2, Comment 2.  The rule makes clear that it "imposes ethical restrictions that go beyond those imposed by constitutional provisions." Id.  Here, the agents were not conducting an investigation; they were attempting to wring a confession from Guzman in the absence of his counsel.  This is precisely the type of contact that the rule was intended to foreclose.  Plainly, re-interrogation of Guzman, if conducted personally by the United States Attorney would violate the rule. See United States v. Hammad, 846 F.2d 854, 860 (2nd Cir. 1988) ("Clearly, clandestine interrogation by an Assistant United States Attorney would contravene his ethical obligation.").  It would make no difference under the rule if the re-interrogation were conducted by a surrogate.

Casualty & Surety Co., 768 F.Supp. 1186, 1214-15 (W.D. Mich. 1990) (finding that the ethical no-contact rule applied to non-lawyers hired by lawyers to collect evidence from adverse party). See also United States v. Smallwood, 365 F.Supp. 2d 689, 697 (E.D. Va. 2005) (stating that "it is sensible to conclude that a lawyer's assistants and investigators, when acting on behalf of the lawyer, must comply with Rule 4.2's commands for communications with represented parties."); United States v. Chavez, 902 F.2d 259, 266 (4th Cir. 1990) (stating that "both government lawyers and government agents must be aware and respectful of the ethical guideline that forbids ex parte contacts with a represented defendant.").

Suppression of evidence is a sanction for violating the anti-contact rule. The Hammad court found that the exclusionary rule "may be ordered in the district court's discretion" in cases of a violation of Rule 4.2, for the "exclusionary rule has application to governmental misconduct which falls short of a constitutional transgression." 858 F.2d at 840-41. In United States v. Thomas, 474 F.2d 110, 112 (10th Cir. 1973), cert. denied, 412 U.S. 932 (1973), the Tenth Circuit excluded a defendant's written statement obtained by a state law enforcement agent without the knowledge or consent of defense counsel. The court ruled that suppression was not only permitted, but actually required, when a violation of the ethical canon had occurred. See also United States v. Durham, 475 F.2d 208 (7th Cir. 1973)

-21-

(holding that incriminating statements obtained by a government agent from a person known to be represented by legal counsel were inadmissible).

For these reasons, the statement of defendant taken on November 12, 2003 should be suppressed.

<u>CONCLUSION</u>

For the reasons set forth above, defendant's statements made on June 9, 2003 and on November 12, 2003, must be suppressed.

HARRY GUZMAN
By his attorneys,

David A Ruhnke, Esq.
Carl N. Donaldson, Esq.
Charles P. McGinty

/s/ Charles P. McGinty

Charles P. McGinty
  B.B.O. #333480
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

August 10, 2005