UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA       )
                               )
          v.                   )       CRIMINAL NO. 04-10186-JLT
                               )
HARRY GUZMAN                   )

## OPPOSITION TO MOTION TO SUPPRESS STATEMENTS

The government hereby respectfully opposes the defendant's motion to suppress two statements that he made to law enforcement officers, one on June 9, 2003 at the Lawrence Police Department and the other on November 12, 2003 at the Essex County Correctional Facility.  Because the defendant initiated the conversation leading to the first of these statements, and because (a) there was a break in custody between the two statements, (b) the defendant was not in "custody" for Miranda purposes at the time of the second statement,  and (c) the defendant, in any event, waived his Miranda rights, the defendant's motion should be denied.

## BACKGROUND

The defendant is charged in this case with two violations of 18 U.S.C. § 844(i), the federal arson statute, based on incendiary fires that occurred on April 3 and June 9, 2003, in Lawrence, Massachusetts.  The first of these resulted in the death of a young mother and her infant daughter and extensive damage to multi-unit residential rental property.  The second fire was set on the rear porch of similar property but, owing to

alert tenants, was extinguished shortly after it was set.

The defendant was arrested in the immediate aftermath of the June 9 fire.  Law enforcement officers had been surveilling the defendant's girlfriend's building, in which the defendant sometimes stayed, and were also monitoring the building with video cameras.  Shortly before 4:00 a.m. on June 9, the defendant was observed emerging from the rear of 197 West Street holding something and heading down West Street.  The defendant turned the corner toward Washington Street, a street located one block over from, and parallel to, West Street.  Investigators followed in a loose surveillance, but the defendant was not in sight when they turned the corner.  Shortly thereafter investigators smelled smoke, and found it to emanate from an arson fire that had been set using gasoline at the rear porch area of 34 Washington Street, another multi-unit dwelling.  As noted previously, tenants fortunately quickly became aware of and extinguished the fire.

The defendant returned to 197 West Street and hid something under garbage bags.  He then stood on the rear porch of 197 West Street, looking in the direction of 34 Washington Street, where the fire had been set.  He fled inside when investigators approached the back of the building.  A third-floor tenant[1] allowed investigators into his apartment, and they found the

_____

[1]The defendant's girlfriend lived on the second floor.

2

defendant in a bedroom with covers over him.  He started yelling,
in substance, "Who is it?  Who is it?"  Upon being removed from
the bed and informed that he was under arrest for arson, the
defendant blurted out, in substance, that he had done nothing
wrong and had been sleeping up in the third floor apartment,
claiming that he had been up there for hours sleeping and that
the police were just out to get him.

**Circumstances Surrounding First Statement**

As set forth in the Affidavit of Massachusetts State Police
Trooper Mark Gravini, he participated in 2003 in the
investigation of a series of fires that occurred in Lawrence,
Massachusetts between March 31, 2003 and June 9, 2003, including
the April 3 fatal fire charged in Count One.  As part of that
investigation, he interviewed the defendant on April 8, 2003.
The defendant spoke to Trooper Gravini about both the fatal fire
and a fire that occurred in 197 West Street on April 5, 2003.
Trooper Gravini reduced to writing what the defendant told him,
and the defendant both signed it and initialed the pages.

Trooper Gravini also had contact with the defendant on other
occasions.  There was a lot of fear and concern in the community
over the fires, particularly after the fatal fire, and Trooper
Gravini and other investigators were often in the neighborhood
speaking with witnesses and conducting other investigation.  All
of the fires occurred near the home of the defendant's girlfriend

at 197 West Street, where the defendant stayed, and Trooper Gravini would sometimes see the defendant on the street and exchange greetings with him.

As further indicated in Trooper Gravini's affidavit, he was contacted at home early on the morning of June 9, 2003, and told that the defendant had been arrested for an arson fire that had occurred that morning.  Trooper Gravini went to the Lawrence Police Department and saw Sergeant Robert Irwin, who told him that the defendant had been advised of his <u>Miranda</u> rights prior to Trooper Gravini's arrival and indicated that he wished to call a lawyer, at which point Sergeant Irwin had stopped talking to the defendant.

The defendant was sitting in the Captain's office.  Trooper Gravini was in the detective's space, and the defendant could see him through a glass window and said hello to him.  Trooper Gravini went in and shook his hand.  He asked the defendant how he was.  The defendant then began to talk to Trooper Gravini, indicating that he had a family to protect and was scared.  He told Trooper Gravini he had heard something about the fatal fire and spoke to Trooper Gravini about what he said he had heard. After he had provided some initial information about what he said he had heard, he again indicated that he needed to think of his family and do what was best for them, and stated that if his information could help him out on the case he had been arrested

4

for that was good, but if it did not help him that was alright
too.  He then continued to provide further details about what he
said he had heard.

Once the conversation ended, Trooper Gravini showed the
defendant again a written version of his <u>Miranda</u> rights and began
to explain them to him again.  The defendant told Trooper
Gravini, however, that he did not want to make a written
statement without having his lawyer present, and Trooper Gravini
immediately stopped speaking with him.

**Circumstances Surrounding November 12 Statement**

As indicated in the defendant's motion, the defendant was
initially charged in state court with the June 9 fire.  Attorney
Carl Donaldson represented the defendant with respect to that
state case.  The defendant was not held in custody continuously
on that case but, instead, was released following a
"dangerousness" hearing.  He later was returned to pretrial
custody when he violated the terms of his release.  In November
2003, he was being held at the Essex County Correctional Facility
("Middleton").

As indicated in the Affidavit of ATF Special Agent
Konstantinos Balos, as of November 12, 2003, Special Agent Balos
knew that the defendant was facing state charges connected with
the June 9 fire.  Special Agent Balos knew that a lawyer was
representing the on those pending state charges, but he had no

5

information that this lawyer, or any other lawyer, represented
the defendant with respect to the then uncharged arson that
occurred on April 3, 2003.

On November 12, 2003, Special Agent Balos went with ATF
Special Agent Thomas Wlodyka to Middleton.  Special Agent Balos
previously had spoken with Assistant Deputy Superintendent
Bradley Upton and told him, in substance, that he wanted to set
up an interview with the defendant.  Assistant Deputy
Superintendent Upton advised Special Agent Balos that the policy
at that facility was that, prior to any such interview, a
prisoner first had to agree to speak with law enforcement.  After
Special Agents Balos and Wlodyka arrived at Middleton that day,
they met with Assistant Deputy Superintendent Upton, and then
waited while he or another member of the staff asked the
defendant whether he was willing to speak with ATF.  After the
defendant had told Middleton staff that he was willing to speak
with ATF, the agents were escorted to a conference room.
Middleton staff then brought the defendant to the room.  He was
not handcuffed.  Assistant Deputy Superintendent Upton asked him
to sign a form acknowledging that he had agreed to speak with ATF
agents.  The defendant signed the form, a copy of which is
attached as Exhibit A the Special Agent Balos's Affidavit.
Assistant Deputy Superintendent Upton left the room, indicating
that a member of the Middleton staff would be waiting outside.

The defendant sat in the chair positioned closest to the door. Special Agent Balos told the defendant that the door, through which Assistant Deputy Superintendent Upton had just left, was unlocked, and the defendant could leave the room any time he wanted to. Special Agent Balos told him that the agents were not there to talk to him about his charged offense. Special Agent Balos told him that, because he was in jail, the agents had to advise the defendant of his <u>Miranda</u> rights before they could talk to him. Special Agent Balos then explained his rights to him, using an ATF form as a guide. As Special Agent Balos began advising him of his rights, the defendant said, in substance, that he was familiar with the procedure. Special Agent Balos told the defendant that he still had to explain his rights to him, and did so. At the end Special Agent Balos asked the defendant whether he understood his rights, and the defendant indicated that he did and was familiar with the procedure. He signed the ATF form acknowledging that he understood his rights, a copy of which is attached as Exhibit B to Special Agent Balos's Affidavit.

The defendant then asked what the agents wanted to talk about. Special Agent Balos told him, in substance, that they wanted to talk about the fatal fire that occurred on Manchester Street where the mother and her baby died. Special Agent Balos asked him to listen to what they had to say, and that it would be

7

his decision whether he wanted to talk to them.  The defendant
said, in substance, "Go on."  The agents then talked with him
about his family, life in Lawrence, the West Street neighborhood,
and the role of agents as factfinders.  The agents then started
to talk about the investigation of the April 3 fire.  They told
the defendant, in substance, that another person had implicated
the defendant as having set the fire, that witnesses had seen him
at the building just before the fire, and that the agents had no
doubt that he had done this.  The agents told him, in substance,
that people thought that the person who did this is a monster,
but that there is a difference between intending to kill somebody
and an accident.  The agents showed the defendant photographs of
the victims.  The agents said that there was a lot of pain that
was caused to the victims' family, indicating that the defendant,
as a father, could relate to what the father of the infant victim
was going through.  The defendant then said to the agents that it
had been bothering him and causing him to lose sleep.  Special
Agent Balos asked whether he wanted to tell the agents what
happened, and he said, in substance, "This is what happened."
The defendant then related his version of the events surrounding
the April 3 fire.  In so doing, the defendant did not claim that
he did not set the fatal fire.  As he told the agents his
version, the agents did not challenge him but simply sought to
clarify details of his account.

8

While not recounted in Special Agent's Affidavit, the defendant told the agents, in substance and among other things, that he was sleeping in a car parked next to 197 West Street the night of the fire. About 30 minutes before it started, a 16-year-old male approached him and the two shared a "blunt." This person told the defendant that a Hispanic male named "Chapo" had sold him some bad drugs, and suggested that they "torch" Chapo. The defendant gave this person a sheet and a plastic juice container with gasoline in it, and they went to Chapo's building, located next to 48-50 Manchester Street, where the other person tried to start a fire but was unsuccessful. This person then, with the defendant as lookout, went to 48-50 Manchester Street, went up the rear exterior stairs to the third-story porch, retreated down to the second floor, poured gasoline on the sheet, lit it on fire, and ran with the defendant away from the building. In short, the defendant told investigators that he aided and abetted the April 3 fire by providing the accelerant and serving as a lookout.

As indicated in Special Agent Balos's Affidavit, after the defendant had related his version of the events, Special Agent Balos asked him whether he felt better and he said that he did. Special Agent Balos told the defendant that the agents wanted to get what he had said into a written or recorded statement. The defendant said that he was willing to make both a written and a

recorded statement but that he wanted to have his attorney present. This was the first time the defendant had indicated he wanted a lawyer. Prior to this, the defendant had never told the agents that he wanted his lawyer, and at no time did either Special Agent Wlodyka or Special Agent Balos advise him that he did not need a lawyer or try to dissuade him from having a lawyer present. Once the defendant indicated he wanted a lawyer present for a written and/or recorded statement, the agents stopped asking him questions about the April 3 fire.

At the end of the interview, the defendant signed the waiver portion of the ATF form reflecting the time at which he had decided to waive his rights and speak with the agents. Neither Special Agent Balos nor Special Agent Wlodyka told the defendant that this was a form to show their boss that they had met with the defendant. Instead, it is the bottom of the same form he had signed at the very beginning of the meeting acknowledging that he had been advised of, and understood, his <u>Miranda</u> rights.

Prior to meeting with the defendant on November 12, 2003, neither Special Agent Wlodyka nor Special Agent Balos spoke to any Assistant U.S. Attorney or any member of the U.S. Attorney's Office about their plan to try to interview the defendant. At no time during the meeting with the defendant did either of the agents make any reference to a federal grand jury.

**ARGUMENT**

**I.    THE JUNE 9 STATEMENT SHOULD NOT BE SUPPRESSED**

The defendant argues that his statement to Trooper Gravini on June 9, 2003 should be suppressed because he earlier had invoked his right to counsel by telling Sergeant Irwin that he wished to call his lawyer.  Both the defendant's affidavit and his motion, however, ignore the fact that it was he, and not Trroper Gravini, who initiated the conversation about the April 3 fire.  Because it was the defendant who did so, the defendant's motion must fail.

In United States v. Cleveland, 106 F.3d 1056, 1064 (1st Cir. 1997), the First Circuit upheld the admission of the defendant's statements notwithstanding his claim that he had invoked his right to counsel because it was he who had initiated the contact with the agents that led to the statement.  In so doing, the First Circuit cited Edwards v. Arizona, 451 U.S. 477, 484-86 (1981), for the proposition that "once a defendant has asked for an attorney, she is not subject to further interrogation by the police until after counsel has been made available to her unless she herself initiates further communication with the authorities".  Cleveland, 106 F.3d at 1064; see also Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983); United states v. Fontana, 948 F.2d 796, 805-06 (1st Cir. 1991)(initiation of interrogation by accused broadly interpreted); Watkins v.

11

<u>Callahan</u>, 724 F.2d 1038, 1042 (1st Cir. 1984)("an accused is not powerless to countermand an election to talk to counsel"); <u>United States v. Velasquez</u>, 885 F.2d 1076, 1086-87 (3d Cir. 1989); <u>United States v. Ware</u>, 338 F.3d 476, 480-81 (6th Cir. 2003).

Here, the defendant initiated the contact with Trooper Gravini by waving to him.  When Trooper Gravini responded by shaking the defendant's hand and asking him how he was, the defendant began talking to him about the April 3 fire.

The defendant's initiation of this conversation, moreover, makes perfect sense when placed in context.  The defendant had been arrested that early morning for the June 9 fire, knowing that he had all but been caught red-handed and understandably not having much he wanted to say about it.  It was in the context of that arrest that, upon being advised of his <u>Miranda</u> rights, he indicated he wished to call a lawyer.  When, however, he saw Trooper Gravini, who had spoken to him approximately two months earlier regarding the April 3 fire, the defendant perceived a potential for helping himself out with respect to the June 9 fire by giving Trooper Gravini information about the April 3 fire. Indeed, he specifically told the Trooper that if the information he was providing could help him out on the matter for which he had been arrested, that was good (although if it did not, that was alright as well).  As Exhibit B to Trooper Gravini's Affidavit reveals, the defendant made no statements on this

12

occasion that inculpated him, and instead provided information
that somebody else was responsible (the same person he would
later say he aided and abetted).  He also manifested to the end
an understanding that the decision both to speak, and to speak
without a lawyer, remained his, by declining at the end of the
conversation to reduce what he had said to a written statement
without his lawyer.

In sum, the defendant's motion to suppress the June 9
statement fails because, even assuming he had effectively invoked
his right to counsel, he thereafter countermanded that invocation
by initiating conversation with Trooper Gravini.

**II.  THE NOVEMBER 12 STATEMENT SHOULD NOT BE SUPPRESSED**

> **A.   The Taking of the Statement Did Not Violate Davis**

The defendant claims that the statement he made on November
12, 2003 was in violation of the rule enunciated in Davis v.
United States, 512 U.S. 452, 458 (1994), that "a suspect who has
invoked the right to counsel cannot be questioned regarding any
offense unless an attorney is actually present."  The defendant
also relies in this regard on Arizona v. Roberson, 486 U.S. 675
(1988), and Minnick v. Mississippi, 498 U.S. 146, 152 (1990), two
cases in which the defendants invoked their rights to counsel and
officers (rather than the defendants) reinitiated contact that
led to statements.

The critical distinction between Roberson and Minnick and

13

the case at bar, however, is that in those cases the defendants were held in continuous custody, while in the instant case, as the defendant candidly admits, there was a break in custody when the defendant was released following his dangerousness hearing. In <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 177 (1991), the Supreme Court stated: "If the police . . . [after a suspect in custody has invoked his right to counsel] subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." Numerous Courts of Appeal have recognized that the operative language in <u>McNeil</u> is the phrase, "assuming there is no break in custody." For example, in <u>United states v. Bautista</u>, 145 F.3d 1140, 1150 (10th Cir. 1998), the Tenth Circuit, relying on <u>McNeil</u>, held that a "six day break in custody was sufficient to remove the effects of [the defendant's earlier] invocation of his <u>Miranda</u> right to counsel."

Similarly, in <u>United States v. Harris</u>, 221 F.3d 1048, 1052-53 (8th Cir. 2000), the Eighth Circuit held that a suspect who was not in continuous custody between the time he requested a lawyer on one day and was reinterrogated and confessed the next day was not entitled to suppression of his statement because

there had been a break in custody.  In so doing, the Eighth
Circuit noted that the prophylactic rule requiring suppression of
uncounseled statements made in a custodial setting after a
request for counsel[2] is designed to prevent police from
"badgering" a witness into waiving his previously-asserted
<u>Miranda</u> rights.  <u>Harris</u>, 221 F.3d at 1052, citing <u>Michigan v.</u>
<u>Harvey</u>, 494 U.S. 344, 350 (1990).  The Eighth Circuit noted that
concern that a suspect will be "badgered" is greatest where a
suspect remains in confinement from the time he requests a lawyer
until the time the police attempt to reinterrogate him, but that
this "concern is not present . . . where a person is not in
continuous custody and the coercive effects of confinement
dissolve."  <u>Id</u>., citing <u>United States v. Barlow</u>, 41 F.3d 935,
945-46 (5th Cir. 1994).  <u>See also</u> <u>McFadden v. Garraghty</u>, 820 F.2d
654, 660-61 (4th Cir. 1987); <u>United states ex rel. Espinoza v.</u>
<u>Fairman</u>, 813 F.2d 117, 125 (7th Cir. 1994), <u>overruled on other</u>
<u>grounds</u>, <u>United States v. LaGrone</u>, 43 F.3d 332 (7th Cir. 1994);
<u>United States v. Skinner</u>, 667 F.2d 1306, 1309 (9th Cir. 1982);
<u>United States v. Geittmann</u>, 733 F.2d 1419, 1425 (10th Cir. 1984);
<u>Dunkins v. Thigpen</u>, 854 F.2d 394, 397 (11th Cir. 1988).

Here, assuming the defendant's invocation of his right to
counsel was effective at its inception and was not superseded by

---

[2]Absent a situation such as that on June 9, 2003, where it
was the defendant rather than the police who initiated the
conversation leading to the statement.

15

his own decision to talk to Trooper Gravini after the invocation, there was a clear break in custody between the invocation on June 9 at the Lawrence Police Department and the much later statement to the ATF agents at Middleton.  Accordingly, the defendant's reliance on <u>Davis</u> in seeking suppression of the November 12 statements is misplaced.

### B.    The Defendant Did Not Ask for Counsel

As a factual matter, as Special Agent Balos's Affidavit makes clear, the defendant did not indicate until the very end of their conversation, when he was told the agents would like to commit his statement to writing and/or recording, that he wished to have counsel for that purpose.  At no previous point during the interview of November 12, 2003 did the defendant tell the agents he wanted a lawyer.  When he told the agents he did want counsel for a written or recorded statement, the agents honored his stated desire and did not pursue the matter further or, indeed, even talk to him further about the April 3 fire.  Accordingly, there is no basis for suppressing the defendant's November 12 statement on the ground that, during that interview, he invoked a right to counsel.

The fact that the agents did not contact the lawyer representing the defendant in state court with respect to the June 9 fire is wholly immaterial.  The defendant's Sixth Amendment right to counsel had not attached with respect to the

16

as-the-uncharged April 3 fire.  See <u>Texas v. Cobb</u>, 532 U.S. 162, 168 (2001).  Furthermore, the fact that the Sixth Amendment right to counsel -- which is offense-specific -- has attached with respect to a charged crime does not result in the automatic attachment of the Fifth Amendment right to counsel with respect to other, uncharged offenses.  <u>McNeil</u>, 501 U.S. at 175.  Here, the agents had no information that any lawyer represented the defendant regarding the uncharged fire and there was no constitutional prohibition in their approaching the defendant.

### C. <u>The Agents Did Not Delay Obtaining a Waiver</u>

The defendant next suggests that the agents delayed obtaining a waiver from the defendant until after he had made his statement.  In fact, however, the agents simply had the defendant acknowledge in writing at the end of the interview a waiver that had already occurred.

An express waiver of <u>Miranda</u> rights is not required.  <u>E.g.</u>, <u>North Carolina v. Butler</u>, 441 U.S. 369, 373, 375-76 (1979); <u>see also</u>, <u>e.g.</u>, <u>Bui v. DiPaolo</u>, 170 F.3d 232, 238 (1st Cir. 1999); <u>United States v. Garcia</u>, 983 F.2d 1160, 1169 (1st Cir. 1993).  A waiver can be inferred from the totality of the circumstances.  <u>See Moran v. Burbine</u>, 475 U.S. 412, 421 (1986); <u>see also Sweeney v. Carter</u>, 361 F.3d 327, 331 (7th Cir. 2004).  Here, there is no basis to believe the defendant has other than average intelligence.  <u>See United States v. Rosario-Diaz</u>, 202 F.3d 54, 69

(1st Cir. 2000)(valid written waiver by defendant with I.Q. in mid-70s). The defendant was almost 23 at the time he made the statement. <u>See</u>, <u>e.g.</u>, <u>United States v. Burrous</u>, 147 F.3d 111, 116 (2d Cir. 1998)(written waiver valid where 16-year-old defendant fluent in English and arrested on similar charges a month earlier). The defendant had familiarity with the criminal justice system, given his arrest on June 9 and his other encounters with law enforcement reflected in his Pretrial Services Report; indeed, he insisted twice to Special Agent Balos on this very occasion that he was familiar with the process. <u>See</u>, <u>e.g.</u>, <u>United States v. Palmer</u>, 203 F.3d 55, 61 (1st Cir. 2000)(written waiver valid in part because defendant had 16 prior arrests); <u>Burrous</u>, 147 F.3d at 116. There is no evidence that the defendant's physical or mental condition was impaired or that, as he was being held at Middleton, he was under the influence of drugs or alcohol. <u>See United States v. Rosario-Peralta</u>, 199 F.3d 552, 564 (1st Cir. 1999)(waiver valid even though defendants had been in boat collision recently); <u>Palmer</u>, 203 F.3d at 60-61 (waiver valid despite defendant's heroin withdrawal and use of antidepressants).

Here, the record shows the defendant understood his rights and was capable of invoking them selectively. He invoked his right to counsel on June 9 initially but then, when he thought it might further his interests, initiated contact with Trooper

18

Gravini and discussed the April 3 fire with him.  He demonstrated
that, having initiated this contact, he knew he could reinvoke
his right to counsel at any time when he told Trooper Gravini at
the end that he did not want to make a written statement without
his lawyer.  He indicated to the agents on November 12 that he
was well aware of his rights and signed the Miranda form
acknowledging that he had read and understood his rights.  And,
again, at the end of the interview he demonstrated that he knew
he had the ability at any time to invoke his right to counsel by
telling the agents he wanted his lawyer present for any written
or recorded statement.  See, e.g., DiPaolo (valid waiver properly
inferred because defendant responded selectively to questioning).

    In sum, the defendant's claim that he did not waive his
rights is without merit.

       D.    **The Defendant Was Not in Custody for Miranda Purposes**

    In any event, the defendant was not in custody for Miranda
purposes when the agents saw him at Middleton on November 12,
2003.  Generally, a prison inmate is in custody for Miranda
purposes only if subjected to undue restraint on his freedom
during interrogation.  See, e.g., United States v. Cooper, 800
F.2d 412, 414 (4th Cir. 1986)(inmate not in custody because
questioning took place at inmate's request in less restrictive
area of prison); United States v. Menzer, 29 F.3d 1223, 1232-33
(7th Cir. 1994)(inmate not in custody because voluntarily agreed

                                    19

to questioning in unlocked room, was told could leave, and later answered written questions); <u>Garcia v. Singletary</u>, 13 F.3d 1487 (11th Cir. 1994); <u>United States v. Rogers</u>, 899 F.2d 917 (10th Cir. 1990); <u>Leviston v. Black</u>, 843 F.2d 302 (8th Cir. 1988).  <u>But see</u> <u>Mathis v. United States</u>, 391 U.S. 1 (1968); <u>United States v. Byram</u>, 145 F.3d 405 (1st Cir. 1998).

Here, unlike a defendant under arrest in a police station, the defendant was not obliged to sit in a police-dominated atmosphere.  To the contrary, he had complete control over whether he would even meet at all with the ATF agents.  It was only because he told Middleton staff that he was willing to meet with the agents, and then signed a form confirming that decision, that the meeting even occurred at all.  The interview, moreover, took place in a conference room; the defendant was not handcuffed; the door remained unlocked; and he was explicitly told that he could leave the room at any time.  In short, unlike a suspect who is under arrest and forced to remain in police custody until produced for court purposes, the defendant here had the ability at all times to leave the agents; indeed, he could have foregone the meeting altogether but chose not to.

Accordingly, the defendant was not in custody for <u>Miranda</u> purposes at the time of the November 12 statement.

### E.    There Was No Violation of Ethical Rules

Finally, the defendant's suggestion that there was a

20

violation of Mass. Rule of Professional Conduct 4.2 must be rejected out of hand.  First, the Rule applies to attorneys, not to federal agents.  As Special Agent Balos's Affidavit reveals, notwithstanding the defendant's speculation to the contrary, he did not consult with the U.S. Attorney's Office before he and Special Agent Wlodyka went to Middleton on November 12, 2003.[3] Second, the Rule prohibits communication with a represented person "about the subject of the representation"; it does not prohibit communication with a represented person about some other subject.  Here, Mr. Donaldson represented the defendant with respect to the June 9 fire, which the agents expressly told the defendant they were not there to talk about; it is the government's understanding that Mr. Donaldson did not, however, represent the defendant at that time regarding the uncharged April 3 fire.  Accordingly, the defendant's claim under the Rule is without merit.

---

[3]He also did not tell the defendant anything about a federal grand jury.

21

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motion seeking dismissal of the indictment.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/Robert E. Richardson
Robert E. Richardson
Assistant U.S. Attorney

22