## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )    **CRIMINAL NO. 04-10186-JLT** |
| | ) |
| **HARRY GUZMAN** | ) |

### AFFIDAVIT OF MATTHEW GRAVINI

I, Matthew Gravini, hereby depose and state as follows:

1. I am a Trooper with the Massachusetts State Police and have been so employed for almost eleven years. In 2003 I was a member of the State Police Detective Unit assigned to the Essex County District Attorney's Office. As part of my duties, I participated in the investigation of a series of fires that occurred in Lawrence, Massachusetts between March 31, 2003 and June 9, 2003. One of those fires occurred at around 3:00 a.m. on April 3, 2003 at 48-50 Manchester Street and resulted in the deaths of a young mother and her infant daughter.

2. As part of that investigation, I interviewed Harry Guzman (the "defendant") on April 8, 2003. He spoke to me about both the fatal fire and a fire that occurred in 197 West Street on April 5, 2003. I reduced to writing what he told me and he both signed it and initialed the pages. A copy of that statement is attached as Exhibit A.

3. There was a lot of fear and concern in the community over the fires, particularly after the fatal fire, and I and

1

other investigators were often in the neighborhood speaking with
witnesses and conducting other investigation. All of the fires
occurred near the home of the defendant's girlfriend at 197 West
Street, where the defendant stayed, and I would sometimes see the
defendant on the street and exchange greetings with him.

2. Early on the morning of June 9, 2003, I was contacted at
home and told that the defendant had been arrested for an arson
fire that had occurred that morning. I went to the Lawrence
Police Department and saw Sergeant Robert Irwin, who told me that
the defendant had been advised of his Miranda rights and
indicated prior to my arrival that he wanted to call a lawyer, at
which point Sergeant Irwin had stopped talking to him.

3. The defendant was sitting in the Captain's office. I
was in the detective's space, and the defendant could saw me
through a glass window and said hello to me. I went in and shook
his hand. I asked him how he was. He began to talk to me,
indicating that he had a family to protect and was scared. He
told me he had heard something about the fatal fire and spoke to
me about what he said he had heard. After he had provided
some initial information about what he said he had heard, he
again indicated that he needed to think of his family and
do what was best for them, and stated that if his
information could help him out on the case he had been
arrested for that was good, but if it did not help him

2

that was alright too.  He then continued to provide further details about what he said he had heard.  Attached as Exhibit B are my reports of the circumstances under which the defendant spoke to me and the substance of what he said to me.

4.  Once the conversation ended, I showed the defendant again a written version of his Miranda rights and began to explain them to him again.  The defendant told me, however, that he did not want to make a written statement without having his lawyer present, and I immediately stopped speaking with him.

Signed under the pains and penalties of perjury this 13TH day of September, 2005.

MATTHEW GRAVINI
Trooper, Massachusetts State Police

3

# EXHIBIT  A

4/8/03    1846 hrs

Statement from: Harry Joel Guzman DOB 11-22-80
SS# 01162 3295 , 197 West St 2nd Floor, Lawrence
MA. 978 738 6911
Also Present: Sgt Zuk, Tpr Gravin.

H.G.

On the night of the big fire, I went to bed around 10 - 1035 PM after
I was watching TV. My wife went to bed
with me and her sister, Leonelly, had
just gone to bed. Twenty minutes after
laying in bed, her mom, Maria Alverez was
knocking on the door after coming home
from work. My daughter was in bed with
me when her mom came home. My wife,
daughter and I then fell asleep.

        At about 3³⁰ Am, I heard the
sirens and I could hear a lot of co-
mmotion. I could see the lights reflectin
in the room, I looked at the alarm
clock and saw it was 530 Am, I
put on gray sweat pants with a black
stripe and a white Old Navy tie shirt
I put my boots on and I got my
jacket, And then When I was putting
My clothes on, I pushed Soveira and
woke her up. She said "what, what,"
and I told her "look, there is a fire

HG 001

2.

over there." I could see the flames reaching out the roof from my window I could see the smoke too." She got her sandals and sweater and we opened the door and went downstair

I saw Pedro when we came down-stairs. The 1st floor apartment door was partly open and we saw Pedro. He said "Yo, there's a fire over there." me my wife and Pedro went to the fire. I stood there for about an hour with Pedro but my wife came back after about a half hour. After the hour, I went home and Pedro stayed there.

I went to my house to check on my wife and she was sleeping. I came back down and met up with Jose Rivera and he asked me "where is Pedro?" I told him over there, and he wanted me to tell him go home but I couldn't find him. When my wife and I left the room my daughter was still sleeping in our bed. When I couldn't find Pedro I just went home and went back to bed. It

HG 002

H.G. was probably an hour and fifteen or twenty minutes that I was out there.

3.

The night before the fire at my house, 197 West St., I went to the liquor store at around 8pm and bought 2, 40 oz beers of Country Club, it's malt liquor. I went back home and drank them up in my house. My girlfriend's mom wasn't there so it wasn't a problem me drinking them inside. Just me, my wife, and one of my daughters were home. Her mom got home around 10 or 10 something and Natalie, my daughter,

H.G. was already in ~~the~~ MY bed. She, her mom, got home before 11 pm. Me and my wife were ready to go clubbing and we went out. We left around 11 pm to go to Club de Louis. It is a regular club, its a bar-slash

H.G. dance club. I ~~got~~ 90 there sometimes, once in a blee. I had 3 or 4 Coronas, not much, I didn't have much money, my wife had about 2 12oz Coronas probably. It was about 12 or 12 something that we left, we walked. I had a blunt and her mother doesn't like us to smoke, at least not upstairs, so we went to my wife's car that's parked in the yard. We rolled it up and smoked. We start to argue about

H.G. my drinking and she left the car and I followed her to the front hallway. We were

**HG 003**

4.

talking in the hall, loud enough for her mom to wake up and she told us to shut up. Yeah, she came out and told us to shut up. After that Soveira went upstairs and I went back out to the car to cool off. Before, when she used to live in the Deacons we argued a lot but I think, is improving. I fell asleep in the car and a little later, maybe an hour, or a little less she came out to the car.

She woke me up and said "com upstairs." We went upstairs, through the front stairs together. And the front door, the one to the hall, was unlocked, we went upstairs. I took my boots off and my shirt and knocked out, I went to sleep. I woke up to the fire alarm sounding, I think all the alarms in the house were going off, but I didn't know the time exactly. Me, my wife and my daughter were in bed at the time. About a minute after there was knocking on the door, It was the door from the living room into my bedroom. It was my mother in law, Maria knocking, she said "salte" it's get out in Spanish. My wife woke up at about the same time as I did. My wife

H.G.

**HG 004**

5.

went and opened the door and started
talking to her mom, I don't know what
they were talking about. Then my wife
says "Go check down there", it's the
back hallway she was talking about. They
were standing in the living room, in the
area of the entrance to the apartment.
I had to put on my shirt and boots
when I heard the alarms, I ran thru
kitchen to the back door, I opened the
door - I had to unlock it - I looked
and didn't see anything, so I went
downstairs. There is a back hallway and
I went down the stairs. I came to the
door that leads outside to the back **HG. 4asd**
I opened the door and that took me
outside. I didn't see anything or
anyone in the yard.

Two or three seconds after that, the
people from the first floor came out
saying "Humo" smoke. I don't know if
it was the father, but it was a guy.
It was a guy about **HG. My** height.
He was like me, about 170 lbs.
They told me "Humo" and I followed them
in through the living room. I looked
out **H.G.** their door to the front hall. I

**HG 005**

6.

saw some smoke, a headboard and a towel. The headboard was leaning against the wall. There was a small fridge in front of the headboard and the towel was to the left side. I didn't see any flame, it was just smoke. As I had just gotten there I saw Pedro throw the last cup of water, I had just gotten there. I saw him throw one cup of water.

Somebody from downstairs, I don't remember who, told me to call 911. I went back through the inside of the house and up the back porch. I called 911 from the living room phone upstairs.

END 1958


This statement was read back to me and is a true and accurate account of what was said.

Harry Guzman
4/08/03
8:00pm
#2530
Tpr M. C. Gravini

HG 006
#299

# EXHIBIT  B

TO:         FILE

FROM:     Tpr. Matthew C. Gravini

SUBJECT:     Circumstances surrounding statement by Harry Guzman, DOB 11/22/80,
SS 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, made at Lawrence Police Department on 6/9/03 to Tpr Gravini and
Detective Waller

1.          On 6/9/03, this Trooper arrived at the Lawrence Police Department
            after receiving a call that Harry Guzman had been arrested for arson.
            Guzman has been interviewed by the task force set up to investigate a
            series of arson fires in the West St. Lawrence area, including a double
            fatal arson fire, and Guzman was familiar to me. I was advised by Sgt.
            Irwin that Guzman had been advised of his rights and stated that he
            wished to make a telephone call to his attorney prior to my arrival.
            Sgt. Irwin advised me that they stopped talking after his request.
2.          After arriving at the Detective's office, Guzman said hello to this
            Trooper, we shook hands and I asked him how he was. Guzman then
            began to have conversation with me. Guzman relayed the attached
            statement to me. The fire for which Guzman was arrested was never
            discussed. He was visibly upset and was crying at times. He
            mentioned the fact that he was concerned for his family several times.
3.          Once the conversation ended, I provided Guzman with a written copy
            of his rights and began to again explain them to him. He said that he
            did not want to make a written statement without having his attorney
            present. I immediately stopped speaking with Guzman.



TO:       FILE

FROM:     Tpr. Matthew C. Gravini #2530

Statement of Harry Guzman, DOB 11/22/80, SS 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, at Lawrence Police Dept. Detective's Office by Tpr. Gravini and Detective Arthur Waller. Taken on 6/9/03 at approximately 0530.

Harry Guzman stated that he had a family to protect and that he was scared. He then admitted that he had heard something about who was responsible for the fatal fire on Manchester St. Guzman said that he came down from the second floor and heard Juan, whose last name he does not know, and "Tito" talking in the hall. Guzman said that Juan told him that he had lit the fire on Manchester and that he didn't mean to hurt anyone. Guzman said that Juan had been using drugs a lot more since the night of the fire and that he was always high. Guzman described Juan as light skinned with black hair and being taller than Guzman. Guzman also knows Juan's brother, whose name is "Junito."

Guzman then discussed more about his family and how he needed to think of them and do what is best for them. He stated that if his information could help him out on this case that was good but if it did not help him that was alright too.

Guzman then further described how he heard about the fire. He said that 2 ½ week ago he came outside and saw Juan sitting in the white plastic chairs in the rear of the house. He said that Juan was sitting in the chair with his hands covering his face and saying that he did not mean to hurt anybody. Guzman stated that he asked Juan what he was taking about and Juan said that he lit the fire where "that lady and little girl got killed." Guzman said that the conversation took place in Spanish and during Guzman's statement, he would say what Juan had said in Spanish and then translate it into English. Guzman said that Juan explained how he went around the back of the house and went up the porch. Guzman said that Juan told him that he was going to go to the third floor but he heard a noise and lit it on the second floor. Guzman described him putting a blanket from the top to the bottom and using what Guzman described as a spray bottle with Kerosine and a lighter to start the fire. Guzman said that Juan used a spray bottle and a lighter to light the blanket. Guzman first described what was used as a "savana" but when questioned about "savana" meaning sheet and not blanket, he said it was really the same thing and that the word that Juan used was "coricon." Guzman said that he doesn't know anyone who lived at 48-50 Manchester St. Guzman said that he did not know if Juan knew anyone living in 48-50 Manchester St. but said that Juan used to buy drugs from people living on the first floor of a brick house located between 48-50 and Blakelin St. Guzman said that the people selling the drugs were not living in that house any more. Guzman stated that Juan told him that Juan had "brothers and cousins" and that if Harry "ratted him out" he would get him. Guzman said that the night of the fatal fire he was upstairs sleeping with his girlfriend and that he was woken up by the lights of the fire trucks in his room.

HG 008



Guzman also stated again that Juan had been using a lot of drugs lately. Guzman further stated that the night before the fatal fire, Juan didn't have any money but the next day he had a lot of money and some bundles of drugs. Guzman said that he thought that the conversation took place at about 11:30 PM because the liquor store was already closed and he did not have money to go to a bar. Guzman states that they were drinking together. Guzman said that Juan is not on the lease at 197 but often stayed there. Guzman said that he knew that Juan was staying on the 1st Floor of 197 West. St the night of the fatal fire.

Guzman said that he did not know what time he went into the house the night of the fatal fire. Guzman then said that he believed that the car fire (which occurred on June 1 in the lot next to 197 West St) was an insurance job. He didn't know why they were saying that but that he had meant to tell me about it when he saw me at 197. (Task force members were at 197 West St. on June 3, 2003 investigating a fire at 38 Manchester St., the yard of which backs up to the yard of 197 West St).

At that point, Guzman stated that he did not want to make a written statement until he had the opportunity to speak with his attorney.

**HG 009**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   **CRIMINAL NO. 04-10186-JLT** |
| | ) |
| HARRY GUZMAN | ) |

### AFFIDAVIT OF KONSTANTINOS BALOS

I, Konstantinos Balos, hereby depose and state as follows:

1. I am a Special Agent employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed for more than four years. I currently work in the Arson and Explosives Group out of Boston, Massachusetts. As such, I have been involved in the investigation and prosecution of the above-captioned case, in which Harry Guzman (the "defendant") is charged with arson resulting in death, in violation of 18 U.S.C. § 844(i), and arson, in violation of 18 U.S.C. § 844(i), in connection with fires occurring in Lawrence, Massachusetts on April 3, 2003 and June 9, 2003, respectively. I make this affidavit in support of the government's opposition to the defendant's motion to suppress statements.

2. As of November 12, 2003, I knew that the defendant was facing state charges connected with an arson fire that took place on June 9, 2003 at 34 Washington Street, Lawrence, Massachusetts (the "June 9 fire"). I knew that a lawyer was representing him on those pending state charges. I had no information that this

1

lawyer, or any other lawyer, represented him with respect to the
then uncharged arson that occurred on April 3, 2003 at 48-50
Manchester Street, Lawrence, Massachusetts (the "April 3 fire").

3.   On November 12, 2003, I went with ATF Special Agent
Thomas Wlodyka to the Essex County Correctional Facility in
Middleton, Massachusetts ("Middleton"), where the defendant was
then being held in connection with the state arson charges
arising from the June 9 fire.  I previously had spoken with
Assistant Deputy Superintendent Bradley Upton and told him, in
substance, that we wanted to set up an interview with the
defendant.  Assistant Deputy Superintendent Upton advised me that
the policy at that facility was that, prior to any such
interview, a prisoner first had to agree to speak with law
enforcement.  After we arrived at Middleton that day, we met with
Assistant Deputy Superintendent Upton, and then waited while he
or another member of the staff asked the defendant whether he was
willing to speak with ATF.  After the defendant had told
Middleton staff that he was willing to speak with ATF, we were
escorted to a conference room.  Middleton staff then brought the
defendant to the room.  He was not handcuffed.  Assistant Deputy
Superintendent Upton asked him to sign a form acknowledging that
he had agreed to speak with ATF agents.  The defendant signed the
form, a copy of which is attached as Exhibit A.  Assistant Deputy
Superintendent Upton left the room, indicating that a member of

2

the Middleton staff would be waiting outside.

    4.   The defendant sat in the chair positioned closest to the
door.   I told the defendant that the door, through which
Assistant Deputy Superintendent Upton had just left, was
unlocked, and the defendant could leave the room any time he
wanted to.   I told him that we were not there to talk to him
about his charged offense at 34 Washington Street.   I told him
that, because he was in jail, we had to advise the defendant of
his <u>Miranda</u> rights before we could talk to him.   I then explained
his rights to him, using an ATF form as a guide.   As I began
advising him of his rights, the defendant said, in substance,
that he was familiar with the procedure.   I told him that I still
had to explain his rights to him, and did so.   At the end I asked
him whether he understood his rights, and he indicated that he
was and was familiar with the procedure.   He signed the ATF form
acknowledging that he understood his rights, a copy of which is
attached as Exhibit B.

    5.   The defendant then asked what we wanted to talk about.
I told him, in substance, that we wanted to talk about the fatal
fire that occurred on Manchester Street where the mother and her
baby died.   I asked him to listen to what we had to say, and that
it would be his decision whether he wanted to talk to us.   The
defendant said, in substance, "Go on."   We then talked with him
about his family, life in Lawrence, the West Street neighborhood,

3

and the role of agents as factfinders. We then started to talk about the investigation of the April 3 fire. We told him, in substance, that Juan Cruz had implicated him as having set the fire, that witnesses had seen him at the building just before the fire, and that we had no doubt that he had done this. We told him, in substance, that people think that the person who did this is a monster, but that there is a difference between intending to kill somebody and an accident. We showed him pictures of the victims. We said that there was a lot of pain that was caused to the victims' family, indicating that the defendant, as a father, could relate to what the father of the infant victim was going through. The defendant then said to us that it had been bothering him and causing him to lose sleep. I asked whether he wanted to tell us what happened, and he said, in substance, "This is what happened." The defendant then related to us his version of the events surrounding the April 3 fire. In so doing, the defendant did not claim that he did not set the fatal fire. As told us his version, we did not challenge him but simply sought to clarify details of his account.

6. After the defendant had related his version of the events, I asked him whether he felt better and he said that he did. I told him that we wanted to get what he had said into a written or recorded statement. The defendant said that he was willing to make both a written and a recorded statement but that

4

he wanted to have his attorney present.  This was the first time
the defendant had indicated he wanted a lawyer.  Prior to this,
the defendant had never told us that he wanted his lawyer, and at
no time did either Special Agent Wlodyka or I advise him that he
did not need a lawyer or try to dissuade him from having a lawyer
present.  Once the defendant indicated he wanted a lawyer present
for a written and/or recorded statement, we stopped asking him
questions about the April 3 fire.

     7.  At the end of the interview, the defendant signed the
waiver portion of the ATF form reflecting the time at which he
had decided to waive his rights and speak with us.  Neither I nor
Special Agent Wlodyka told him that this was a form to show our
boss that we had met with the defendant.  Instead, it is the
bottom of the same form he had signed at the very beginning of
the meeting acknowledging that he had been advised of, and
understood, his Miranda rights.

     8.  Prior to meeting with the defendant on November 12,
2003, neither Special Agent Wlodyka nor I spoke to any Assistant
U.S. Attorney or any member of the U.S. Attorney's Office about
our plan to try to interview the defendant.  At no time during
the meeting with the defendant did either of us make any

reference to a federal grand jury.

Signed under the pains and penalties of perjury this 16th day of September, 2005.

/s/ Konstantinos Balos
KONSTANTINOS BALOS
Special Agent, ATF

6

# EXHIBIT  A

*Essex County Correctional Facility*

&

*Sheriff's Headquarters*

**FRANK G. COUSINS, Jr.**
**SHERIFF**

POST OFFICE BOX 807
20 MANNING AVENUE
MIDDLETON, MA 01949-2807

TELEPHONE
(508) 750-19
FAX
(508) 750-19

I _Harry Guzman 306 442_ AGREE TO SPEAK WITH

_____ FROM THE _ATF_

ON THIS DATE _11-18 03_ Boston Det wrong

BALOS, K. Dino
WLODYKA, Tom

_[signature]_

_[signature]_ **SIGNATURE**

_[signature]_ **WITNESS**

**HG 013**

# EXHIBIT  B

## DEPARTMENT OF THE TREASURY
### BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
# WAIVER OF RIGHT TO REMAIN SILENT AND OF RIGHT TO ADVICE OF COUNSEL

### STATEMENT OF RIGHTS

You must understand your rights before we ask you any questions.

You have the right to remain silent.

Anything you say can be used against you in court, or other proceedings.

You have the right to talk to a lawyer for advice before we question you and to have him/her with you during questioning.

If you cannot afford a lawyer and want one, a lawyer will be appointed for you by the court. If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time. You also have the right to stop the questioning at any time until you talk to a lawyer.

I have read this statement of my rights and it has been read to me, and I understand what my rights are.

Date  11 /12 /03

Time  11:15 am

Signature

### WAIVER

I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my rights, and I am willing to make a statement and to answer questions.

Date  11 /12 /03

Time  12:15 pm

Signature

### CERTIFICATION

I hereby certify that the foregoing Waiver of Right to Remain Silent and of Right to Advice of Counsel were read by me to the above signatory, and that he/she also read it and has affixed his/her signature hereto in my presence.

Witness

Signature

Witness

ATF F 3200.4 (5-94) PREVIOUS EDITIONS ARE OBSOLETE

**HG 014**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) **CRIMINAL NO. 04-10186-JLT** |
| | ) |
| **HARRY GUZMAN** | ) |

**AFFIDAVIT OF ROBERT E. RICHARDSON**

I, Robert E. Richardson, hereby depose and state as follows:

1. I am an Assistant United States Attorney responsible for
the prosecution of this matter. I have reviewed the Affidavit of
Carl Donaldson, Esq. As Mr. Donaldson's Affidavit indicates, it
is my understanding that he was retained by the defendant's
family to represent the defendant shortly after the defendant's
arrest on June 9, 2003.

2. It is further my understanding that, more specifically,
Mr. Donaldson represented the defendant with respect to the June
9 fire. Mr. Donaldson did appear at the federal courthouse on
March 4, 2004, under the mistaken belief that the defendant was
being produced in the grand jury that day. On a date thereafter
I spoke with Mr. Donaldson by telephone to clarify his
representation of the defendant. Mr. Donaldson told me, in
substance, that he represented the defendant with respect to the
June 9 fire but did not represent him with respect to the April 3
fire because it had not yet been charged. Mr. Donaldson
indicated that he thought it likely that the family would retain

1

him if the defendant were charged with the April 3 fire.   Mr.
Donaldson indicated that he was going to be away on vacation and
asked that I contact another attorney if the defendant was
charged while he was away.

Signed under the pains and penalties of perjury this 16th day of
September, 2005.


ROBERT E. RICHARDSON

2