UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA     )
                                )
        v.               )   CRIMINAL NO. 04-10186-JLT
                                )
HARRY GUZMAN            )

MOTION TO EXCLUDE TESTIMONY RELATING TO THE
CAUSE AND ORIGIN OF THE FIRE CHARGED IN COUNT ONE

Pursuant to Fed. R. Evid. 702, defendant seeks to exclude expert arson testimony relating to the fire charged in count one of the indictment.  Count one alleges that on April 3, 2003, Mr. Guzman, acting as a principal or as an aider and abetter, set fire to a three-story wood framed house at 48-50 Manchester Street in Lawrence, MA.  Two persons died in the fire, and the structure sustained extensive damage, including to the third floor and to the rear of the dwelling.  The government hypothesizes that the fire started on an outside rear porch.  It offers no proof that an accelerant was used.

Because "the admissibility of all expert testimony is governed by the principles of Rule 104(a)," the proponent of the expert testimony, here the government, "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."  Fed. R. Evid. 702 advisory committee's note (citing Bourjaily v. United States, 483 U.S. 171 (1987)); see also United States v. Monteiro, 407 F.Supp. 2d 351 (D.Mass. 2005).

I.   Arson Testimony After Daubert and Kumho Tire

     In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.
579 (1993), the Supreme Court established that the trial court
must function as gatekeeper to assure the reliability and
relevance of expert scientific testimony.   In Kumho Tire Co. v.
Carmichael, 526 U.S. 137 (1999), the Court extended the ruling to
technical fields, that are not, strictly speaking, science.

     In theory, the Daubert-Kumho rulings opened courts to new
types of scientific and technical evidence (provided they
satisfied the standards for rigor set by Daubert).   But the
rulings also forced proponents of such evidence to demonstrate
that they were the "product of reliable principles and methods."
Fed. R. Evid. 702.   Following Daubert, "all types of expert
testimony present questions of admissibility for the trial court
in deciding whether the evidence is reliable and helpful."   Fed.
R. Evid. 702, advisory committee's note.   Thus, post-Daubert and
Kumho, it is no longer sufficient to proffer that an expert's
area of learning is "generally accepted" in the scientific
community.   Instead, a proponent must show that the method used
to reach a conclusion is scientifically sound and that the
opinion is based on facts which satisfy Rule 702's reliability
requirements.

     The advent of the new standards under Daubert raised
concerns among practitioners in the field of arson investigation.

Worried that their methods were inadequate to satisfy the new legal standard, they submitted an amicus brief to the Supreme Court in Kumho Tire Co. v. Carmichael seeking to exempt themselves from Daubert, claiming that arson investigation was based on "experience" and should be excused from showing its scientific validity. Brief of Amicus Curiae International Association of Arson Investigators, et al. The Court in Kumho flatly rejected this approach. See also Michigan Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 919-20 (11th Cir. 1998)[where a similar brief was submitted].

Arson investigators had reason to be concerned about the new proof standard. They are usually untrained in science.

> The entire arson field has a low level of qualification. In the typical case, an arson investigator is a fire officer with a very limited technical education. Unlike some other areas of forensic science, fire pattern research was rarely funded, and educational programs were limited to in-service training of fire personnel.

Vincent Brannigan & Jose Torero, The Expert's New Clothes: Arson 'Science' After Kumho Tire, 43 FIRE CHIEF 60 (1999). Nor is there much science in the field of arson investigation:

> Many of the arson indicators which are commonplace assertions in arson prosecutions are deficient for want of any established scientific validity. In many instances the dearth of published material in the scientific literature substantiating the validity of certain arson indicators should be sufficient grounds to mount a challenge to the general scientific acceptability of such indicators. It is clear, from the cases, however, that arson indicators are given a talismanic quality that they have not earned in the

crucible of scientific validation.

A.A. Moenssens, J.E. Starrs, Carol Henderson and F.E.Inbau, Scientific Evidence in Civil and Criminal Cases, Foundation Press, Mineola, N.Y. (1995) at 459-60.  The scholar Edward Imwinkelreid has similarly questioned the reliability of arson investigation techniques where there is little proof that the techniques yield verifiable results.

> Arson analysts' opinions are vulnerable to ... doubt. Arson investigators rely on certain clues such as concrete "spalling" and char depth to determine the point of origin of a fire.  These clues are plausible and widely accepted by fire department arson investigators.  The difficulty, though, is that there have been few "full-scale burns" of buildings to verify that such factors accurately identify the starting place of a fire.  To make matters worse, nothing in the natural world 'tests' an arson investigator's expertise.  If an arson investigator is wrong, nothing runs aground or burns down.  These clues are in widespread use, but there is little objective evidence that their use yields accurate results.  Without any effort to detect error and evaluate the results of the use of the technique, the analysts might simply be repeating the same mistakes over and over again. [citations omitted].

Edward Imwinkelried, "The Meaning of 'Appropriate Validation' in Daubert v. Merrell Dow Pharmaceuticals, Inc., Interpreted in Light of the Broader Rationalist Tradition, not the Narrow Scientific Tradition," 30 Fla. St. U.L. Rev. 735, 761-2 (2003) . Imwinkelried concludes:

> In the above states of the record, given the Supreme Court's trilogy of decisions, without more the trial judge should rule the foundation inadequate.

Id. at 762.

-4-

In the wake of Kumho Tire, a number of courts have narrowed
or barred arson testimony. In Michigan Millers Mutual Insurance
Corp. v. Benfield, 140 F.3d 915 (11th Cir. 1998), an expert's
testimony was disallowed on the issue of the fire's origin. The
expert opined that, because all accidental causes were
eliminated, the cause of the fire was intentional. Id. at 921.

> [The fire causation expert] stated at trial that he
> came to his opinion that the fire was intentionally set
> by eliminating all accidental causes, and by
> determining that, given that the fire began on the
> dining room table, there were no other possible sources
> of ignition of the fire. Essentially, the testimony of
> [the expert] reveals that he came to his opinion that
> the fire was incendiary largely because he was unable
> to identify the source of the ignition of the fire. In
> determining that the fire was incendiary, [the expert]
> performed no tests and took no samples.

Id. at 921.

Michigan Millers Mutual Insurance was cited approvingly in
Knotts v. Black & Decker, Inc., 204 F.Supp. 2d 1029, 1039-40
(N.D. Ohio 2002). There the court stated:

> Having carefully viewed the factors upon which [the
> fire expert] premises his opinion, the Court finds that
> his opinion is not grounded on anything other than the
> fire investigation report and the witness statements
> contained therein. There is no independent basis or
> analysis grounded either in scientific methodology or
> reliable procedures to support his theory as to the
> origin of the fire.

Id. at 1040.

In Truck Insurance Exchange v. Magnetek, Inc., 360 F.3d 1206
(10th Cir. 2004), the court excluded testimony of an arson
investigator and of a second expert, including testimony that, in

the absence of any other explanation of a fire which began in a
basement area, the cause was the malfunctioning ballast of a
light fixture.  Applying <u>Daubert</u> and <u>Kumho</u>, the trial court
barred the experts from expressing opinions about the actual
cause of the fire.  <u>See also</u> <u>Pride v. BIC Corp.</u>, 218 F.3d 566
(6th Cir. 2000) (court barred expert testimony where the experts
failed to test their hypotheses as to the manufacturing defect
which allegedly caused a fire); <u>Farris v. Coleman Co., Inc.</u>, 121
F.Supp. 2d 1014 (N.D. Miss. 2000)(court rejected testimony that
electric cord started fire, noting that the expert's conclusion
"was reached thusly: There was fire damage where the cord was
located and a short in the cord, ergo the cord caused the fire.
This logic has been condemned by the Fifth Circuit...."); <u>Koken</u>
<u>v. Black & Veatch Constr., Inc.</u>, 426 F.3d 39 (1st Cir. 2005) (the
court excluded portion of expert's testimony regarding a fire
resistant blanket used during welding work); <u>SAFECO Ins. Co. of</u>
<u>America v. Carrier Corp.</u>, 2003 Mich. App. LEXIS 456 (Mich. Ct.
App. Feb. 21, 2003) (the court rejected the opinion of a fire
expert, attributing the cause of a fire to the defective design
of a furnace, finding that the opinion was not supported by
appropriate validation or indicia of reliability); <u>Wolfson v. BIC</u>
<u>Corp.</u>, 95 S.W.3d 527 (Tex. App. 2002) (the expert did not perform
any test, relied on subjective assumptions, and offered no
evidence that the "failure to extinguish" theory had gained

-6-

general acceptance in the relevant scientific community).  See
generally Prado Alvarez v. R.J. Reynolds Tobacco Co., 405 F.3d 36
(1st Cir. 2005).

     Finally, the dangers of unreliable arson testimony are
documented in a report, issued May 2, 2006, by a committee of
arson experts who evaluated testimony used in two capital arson
cases, the Texas trials of Ernest R. Willis, convicted of killing
two women in a house fire in 1986, and of Cameron T. Willingham,
convicted of burning his home in 1992 and killing his three young
daughters.  The report stated that prosecution witnesses in both
cases interpreted fire indicators like burn marks and cracked
glass as evidence that the fires had been set, when these
indicators could have signified an accidental fire.  In the
Willingham trial, the committee found that a deputy state fire
marshal erred in tracing the blaze to an accelerant, stating that
"[e]ach and every one of the 'indicators' listed by [the witness]
means absolutely nothing."  Report on the Peer Review of the
Expert Testimony in the Cases of State of Texas v. Cameron Todd
Willingham and State of Texas v. Ernest Ray Willis, found at
www.innocenceproject.org/press/index.php, at 13.  One of the
accused remains on death row pending review of the report by the
Texas Forensic Science Commission; the other was executed.

II.  The Standards of Proof Required under Daubert/Kumho

     Fed. R. Evid. 702, which codifies the rule of Daubert and

-7-

Kumho Tire, states as follows:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is
> based upon sufficient facts or data, (2) the testimony
> is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods
> reliably to the facts of the case.

Fed. R. Evid. 702.  Under this rule, the Court must first ensure

that the witness is qualified to offer an expert opinion.

Poulis-Minott v. Smith, 388 F.3d 354, 359 (1st Cir. 2004).  Next,

the Court must determine whether all proffered expert testimony

is sufficiently reliable to be admitted, whether "scientific" or

not.  Kumho Tire Co. v. Carmichael, 526 U.S. at 149 (noting that

"[t]he trial judge's effort to assure that the specialized

testimony is reliable and relevant can help the jury evaluate

that [testimony], whether the testimony reflects scientific,

technical, or other specialized knowledge.").  This involves a

determination whether "the reasoning or methodology underlying

the testimony is scientifically valid and of whether that

reasoning or methodology properly can be applied to the facts in

issue."  Daubert, 509 U.S. at 592-93; Gen. Elec. Co. v. Joiner,

522 U.S. 136, 142 (1997).

A critical element of the analysis under Daubert is whether

the testimony has been subjected to "experimental" validation:

Ordinarily, a key question to be answered in

> determining whether a theory or technique is scientific
> knowledge that will assist the trier of fact will be
> whether it can be (and has been) tested.  "Scientific
> methodology today is based on generating hypotheses and
> testing them to see if they can be falsified; indeed,
> this methodology is what distinguishes science from
> other fields of human inquiry."  Green 645. See also C.
> Hempel, Philosophy of Natural Science 49 (1966) ("The
> statements constituting a scientific explanation must
> be capable of empirical test"); K. Popper, Conjectures
> and Refutations: The Growth of Scientific Knowledge 37
> (5th ed. 1989) ("The criterion of the scientific status
> of a theory is its falsifiability, or refutability, or
> testability") (emphasis deleted).

Daubert, 509 U.S. at 593.

At the core of Daubert, then, is the requirement that the discipline at issue demonstrate its validity empirically.  The Court listed four factors which should guide judges in this determination:  (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory's or technique's acceptance within the relevant discipline.  Daubert, 509 U.S. at 593-94.  "These factors, however, are not definitive or exhaustive, and the trial judge enjoys broad latitude to use other factors to evaluate reliability." United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002) (citing Kumho Tire, 526 U.S. at 153).

Once a court has determined that the expert's methodology is valid generally, it must query "whether those principles and methods have been properly applied to the facts of the case."

-9-

Fed. R. Evid. 702 advisory committee's note.  "In other words,
Rule 702, as visualized through the <u>Daubert</u> prism, 'requires a
valid scientific connection to the pertinent inquiry as a
precondition to admissibility.'"  <u>Ruiz-Troche v. Pepsi Cola</u>, 161
F.3d 77, 81 (1st Cir. 1998) (quoting <u>Daubert</u>, 509 U.S. at 592).

III.  <u>The Government's Proposed Testimony Here</u>

The government has disclosed an undated "Fire Origin and
Cause" report, prepared by Lt. Sebastian Bongiorno of the
Lawrence Fire Department.  The report describes a house badly
damaged by fire, both inside and outside.

In his report, Lt. Bongiorno stated that he made an
examination of interior and exterior of the fire-damaged property
at 48-50 Manchester Street, Lawrence.  He described that, upon
entering and examining the first floor of the property, he saw
evidence of burning in the joists near the rear wall (but he
provided no measurements of the depth of joist burn).  He
proceeded to the second floor where he noted that the ceiling
joists in the kitchen area showed "heaviest charring" toward the
rear of the building (again with no measurements of the
charring).  Continuing to the third floor, the examiner noted
heat patterns up the staircase and considerable damage to the
third floor, including to the ceiling and roof from the midpoint
to the rear of the house, which were burned through and
collapsed.  A dividing wall, which separated the two top-floor

apartments and which ran from front to rear, was consumed by the
fire.  On either side of the wall had been the kitchens for the
two units, which ceilings had been burned through and collapsed.

The report stated that:

> After the initial exterior and interior examination of
> the fire building and all its contents and reviewing
> the statements of the occupants of the fire building,
> first on scene fire suppression and law enforcement
> personnel, and other witnesses[,]  All burn and char
> patterns indicate that the area of origin of the fire
> was the rear porch's (sic) on the "C" side [rear] of
> the building.

Report at 5.  One pauses: what were the "burn and char patterns"
which "indicate[d]" that the fire originated from the porches?
Indeed, what fire patterns showed the point of entry of the fire
into the house?  Moreover, what "statements" of witnesses was he
relying upon?  In stating that the "area of origin of the fire
was the rear porch's," it is entirely unclear whether the
examiner purported to arrive at this conclusion forensically or
was simply adopting unspecified witness accounts regarding the
path of the fire.

The report went on to describe the exterior porches in the
rear, which ran side to side on each floor, connected by stairs.
The porch at the third floor level had collapsed onto the second
level, which was also fire damaged.  According to the report, the
third floor decking was "heavily charred and the joist and
decking were moderately burned through" on the right side (facing
from the rear), while the opposite side showed "heavy charring

-11-

and substantial burn through" of the joists and decking.  No
measurements of the char or burn depth appeared in the report.
The report stated that "[a] sample of the decking was taken at
this point and later lab analysis was negative for the presence
of hydrocarbons."

Searching for a possible accelerant, the investigator
collected four additional sample of debris.  These were taken at
ground level at the rear of the building, at a point near the
rear porches but opposite the side of the building where the
fatalities were found.  One of the samples was found to contain
trace of gasoline.  Notwithstanding the trace of gasoline, this
site was excluded as the point of origin of the fire.

The report concluded that "[t]he point of origin of the fire
was on the second level of the outdoor porches at the rear of the
building.  The fire was incendiary in nature."  Report at 1.  The
report further stated that "[t]he source of ignition was an open
flame deliberately applied to available combustibles."  The
report nowhere identified the "available combustibles" used to
propagate the fire.  The report stated that there had been
"miscellaneous items stored on the rear porches," Report at
HG020, but did not describe the items or their flammability
characteristics.  The report did not claim that any trace of
accelerant was detected at the second floor exterior porch level
where the "open flame" was hypothesized.  The report noted "heavy

charring and substantial burn through of the decking" at the second floor left. It is unclear whether the expert was positing that the area of deepest exterior burn was the point of origin of the fire.

There is little hint that any forensic tools were used. For example, the report makes note of "burn" and "char" marks, but without recording measurements of either; instead, the report relied on comparative (and subjective) terms, such as "heavy charring," "heaviest charring," "moderate burn," and "substantial burn." Thus, the third floor exterior decking is described as "moderately burned through" on one side and "substantial[ly] burn[ed] through" on the other, with no measurement of the depths and no way to replicate the findings so that they can be forensically evaluated. The fire was postulated as starting on "the second level rear porch in the [left] corner," where the decking showed "heavy charring and substantial burn through of the decking," compared to "heavily charred with moderate burn through of the deck surface" on the other side. Obviously, if the depth of burn is the meaningful indicator of fire origin, a measurement would aid the cause (and permit some replication of analysis and verification of results).

Similarly, there is only brief mention of fire "patterns," including of "vertical pattern(s) ascending the stairwell(s)," from second to third floor, with no description of the physical

characteristics of the patterns.  But no patterns are offered to describe the fire's course, in a way that can be examined and the forensic conclusions replicated.  Obviously, if the fire started on the outside, it must have passed inside and the report takes no forensic stab at how that happened.  There were no drawings or data summaries provided from the examiner.  It is difficult to see how to test his conclusions.

Under Daubert, the "reasoning or methodology underlying the testimony [must be] scientifically valid," and further that methodology must be properly "applied to the facts in issue."  As to the former, there is little methodology evidenced.  The report takes the usual pre-Daubert form, an examination of a fire scene starting from an area of least damage and moving to the area of most damage.  But this is hardly a scientific methodology, nor is it terribly helpful here where the interior damage was at least as intensive as the exterior damage.  Since it is difficult to discern what scientific methodology was employed, it is unclear too whether the methodology was properly applied to the facts at issue.

The trial court's gatekeeping function requires more than simply "taking the expert's word for it."  Fed. R. Evid. 702 advisory committee's note (citing Daubert v. Merrell Dow, 43 F.3d 1311, 1319 (9th Cir. 1995)).  Where the hallmark of the Daubert analysis is its insistence that conclusions be the product of

-14-

rigor, based upon data which is testable and verifiable, it is plain that the unsupported and highly subjective conclusions of this report fall well short of sufficient and should be barred at trial.

IV.  <u>Relief Sought</u>

Defendant submits that the testimony of the fire expert should be limited to what this witness himself observed, measured (if he did), and photographed.  He should be barred from testifying on the basis of hearsay statements of others, and should not be permitted to offer an opinion that the fire was incendiary or that the place of origin was the left part of the second floor porch.

This relief, which narrows the permissible scope of the examiner's testimony, mirrors the relief ordered in a number of recent cases in this District.

In <u>United States v. Hines</u>, 55 F.Supp. 2d 62 (D.Mass. 1999), the court ruled that handwriting analysis has never been subject to meaningful reliability or validity testing, comparing the results of the handwriting examiners' conclusions with actual outcomes.  Nor has it been subject to peer review by a competitive, unbiased community of practitioners and academics. To the extent that it has been "generally accepted," it is not by a financially disinterested independent community, like an academic community.  The court noted that some tests have been

done, "but all lacked a control or comparison group of lay persons."  Accordingly, the court narrowed the expert's testimony, holding that the proposed government expert's testimony met "Fed. R. Evid. 702's requirements to the extent that [the expert] restricts her testimony to similarities or dissimilarities between the known exemplars and the robbery note. However, she may not render an ultimate conclusion on who penned the unknown writing."

A similar narrowing of expert opinion was ordered in <u>United States v. Green</u>, 405 F.Supp. 2d 104 (D.Mass. 2005), where the court ruled that a firearms examiner could testify to toolmarks observed on a firearm but not that the toolmarks matched those found on shell casings.

Similarly, in <u>United States v. Monteiro</u>, 407 F.Supp. 2d 351 (D.Mass. 2005), the court issued a preliminary order restricting expert testimony about toolmarkings on a gun due to the failure of the expert to document his testing results, which made replication of his results impossible.

<u>CONCLUSION</u>

For each of these reasons, defendant moves for an order barring the examiner (1) from offering an opinion that the fire was incendiary or that the place of origin was the left part of the second floor porch, and (2) from testifying about the hearsay statements of others.  The examiner's testimony should be limited

to what this witness himself observed, measured (if he did),

collected and photographed at the fire scene.

                                   DAVID A. RUHNKE, ESQ.
                                   CHARLES P. McGINTY, ESQ.
                                   Co-counsel for Harry Guzman


                        By:  /s/ Charles P. McGinty

                             Charles P. McGinty
                               B.B.O. #333480
                             Federal Defender Office
                             408 Atlantic Avenue, 3rd Floor
                             Boston, MA 02110
                             Tel: 617-223-8061


                    CERTIFICATE OF SERVICE

     I hereby certify that this document, filed through the ECF
system, will be sent electronically to the registered
participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-
registered participants on May 22, 2006.

                             /s/ Charles P. McGinty

                             Charles P. McGinty