```
                UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
         v.                 )    CRIMINAL NO. 04-10186-JLT
                            )
HARRY GUZMAN                )
```

### GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits its sentencing matter in this case, in which it urges this Court to impose the guidelines sentence of life imprisonment.

### BACKGROUND

The Court, having presided over the trial of this matter, is fully familiar with the relevant facts.  As the Court will recall, the arson of which the defendant stands convicted was set at approximately 3:00 in the morning.  Evidence at trial showed that it was set on the rear exterior porch, on the second floor. The building, 48-50 Manchester Street in Lawrence, was fully occupied at the time and was filled with sleeping tenants: men, women, and children.  Tragically, while most of the tenants woke up and escaped out the front entrance, two tenants -- Matilda Median and her two-month-old baby, Angelic Duran -- never made it out and succumbed to smoke inhalation up in their third floor apartment.  The defendant made different admissions to different people about his participation in the setting of this fire, but whether he acted as the principal who actually started the fire, or instead acted as an aider an abetter who provided the gasoline

and served as a lookout, he was well aware at the time that he was participating in setting a fire that had the potential for tragic consequences -- a potential that, unfortunately, was realized.

**Other Fires**

As the accompanying affidavit of ATF Special Agent Konstantino Balos reveals, the fire of conviction was but one of a series of nine fires that occurred in this area of Lawrence in a brief, two-month span in 2003. As the map attached to the Balos affidavit shows, all of the fires occurred within a short walk of 197 West Street, the address at which the defendant was then staying with his girlfriend, Solveira Alamo. (In fact, one of the fires was set at 197 West Street itself.) Seven of the nine fires were set in occupied multi-family apartment buildings. Four of the fires, including the fatal fire for which the defendant was convicted and the June 9, 2003 with which the defendant has also been charged in Count Two of the indictment, were set in the exterior rear porch area. The time at which two of the fires were set is unknown, but all of the other fires were set between midnight and 5:15 a.m. The defendant was arrested for the last of these fires on June 9, 2003. After the defendant's arrest, the fires abruptly stopped. Given the geographic proximity of these fires, both to themselves and to the place where the defendant was then staying; given the

temporal proximity of these fires, all occurring between March 31 and June 9 of 2003; given that they stopped suddenly when the defendant was arrested; and given the strong evidence showing the defendant committed the June 9 fire, as outlined below; this Court can readily infer that the defendant was responsible for all of them.  See, e.g., People v. Erving, 63 Cal.App.4th 652 (2d Dist. 1998).

As Special Agent Balos's affidavit indicates, through his participation in the investigation of these fires, he knows that they caused great fear and concern in the neighborhood, particularly when they continued after the April 3 fatal fire had occurred.  He particularly remembers that after the June 4, 2003 fire, which was set on the rear porch of 43-45 Manchester Street, just across the street from where the fatal fire had occurred, the tenants were living with their bags packed because they were so scared that another fire would be set and they would have to leave quickly.

**The June 9th Fire - Count Two**

As set forth in Special Agent Balos's affidavit, by the time of the ninth fire, with which the defendant is charged in Count Two of the indictment, the defendant was under video and conventional surveillance. He was seen early that morning coming from behind 197 West Street with something in his hand.  Law enforcement officers attempted to follow him but lost him after

he turned right from West Street onto Manchester Street. The officers smelled smoke soon thereafter and tried to locate the fire, ultimately determining that a fire had been set in the rear porch area of 34 Washington Street but had quickly been extinguished by a tenant whose dog had alerted him to activity outside the building.

Meanwhile, video surveillance showed the defendant returning to 197 West Street, concealing something among the trash bags outside the building, and then standing on the porch looking toward where the fire had just been set, which was just one street away. When law enforcement officers returned to 197 West Street after assuring themselves that the fire had been extinguished, the defendant ran inside. He was located a short while later in a bedroom, not in Ms. Alamo's apartment, which was on the second floor, but instead in the third-floor apartment. The defendant claimed he had been there for hours, but the tenant told officers that the defendant had only just arrived there.

Investigators obtained a search warrant and recovered a juice container containing gasoline from among the trash bags outside 197 West Street. As the Court will recall from the trial of the fatal fire, when Special Agent Balos spoke with the defendant in November 2003 about the fatal fire, he told Special Agent Balos that the container holding the gasoline that he had provided for use in that fire was a juice container.

In sum, not only is there evidence from which this Court can conclude by a preponderance that the defendant was involved in all nine fires discussed above, but there is particularly strong and compelling evidence from which the Court can find by a preponderance that the defendant set the June 9 fire. Accordingly, the evidence shows that the defendant, having involved himself in the April 3 fire that killed two people, did not stop but instead persisted in the very conduct that had already resulted in deaths and set a fire in the early morning hours in the rear porch area of another occupied building.

**The Defendant's Post-Verdict Conduct**

After the jury returned its guilty verdict on Count One, the defendant, as the Court will recall, created a disturbance in the courtroom and ultimately had to be subdued by means of a projectile stun gun. Special Agent Balos helped to take the defendant out of the courtroom and into the cell in the back. As Special Agent Balos's affidavit recites, in the cellblock, the defendant, not content with his outburst in the courtroom, proceeded to threaten Special Agent Balos, saying, in substance, "You're a fucking liar," "It's not over yet," and "You'll get yours."

**ARGUMENT**

**The Correct Guidelines Sentence Is Life**

The Presentence Report ("PSR") has determined that the defendant's total offense level is 45. PSR ¶36. Specifically, the PSR notes that the offense of conviction here is 18 U.S.C. §844(i); that the relevant guidelines section is USSG §2K1.4; that the offense level from that section is 24; that, however, a cross-reference is provided for at §2K1.4 in this case because death resulted from the offense, and that the most analogous guideline from Chapter 2, Part A should be applied if the resulting offense level is greater than that derived through 2K1.4 itself; that first degree murder is the most analogous provision; and that the relevant guideline, §2A1.1, assigns a base offense level of 43. The PSR then assigns a 2-level enhancement pursuant to §3B1.4 because of the evidence that a 14-year-old boy was employed as a lookout, for a final offense level of 45.[1] The PSR notes, however, that Application Note 2 to Chapter 5, Part A stipulates that any offense level greater than 43 is to be treated as an offense level of 43.

Because the defendant is a career offender, his criminal history category is VI. See PSR ¶50; USSG §4B1.1. Even if the

---

[1] Because the PSR correctly notes that the defendant is a career offender, PSR ¶37, the PSR also computes the guidelines under §4B1.1, but, because this provision produced a lower offense level, the offense level computed under 2A1.1 controls.

defendant's criminal history category were I, however, his guidelines sentence would be life imprisonment.

The defendant objects to the determination that the first degree murder guideline applies, both in his objections to the PSR and in his sentencing memorandum.  Specifically, in his memorandum he argues that §2K1.4, in providing for a cross-reference to the murder guidelines, does not specify which guideline is appropriate  The defendant further argues that 2A1.1 applies in the case of first degree murder, which calls for mandatory life, but that the offense of conviction here -- 18 U.S.C. §844(i) -- provides for a sentence of "any term of years" or life, so that life is not the presumptive sentence.  As the PSR correctly observes in response to the defendant's objections, however, first degree murder, as defined at 18 U.S.C. §1111, includes felony murder resulting from arson.  Moreover, nothing in the guidelines indicates that the potential penalties under the various statutes has any bearing on the correct guidelines provision to apply.  Both the Second Circuit and the Fifth Circuit have indicated that 2A1.1 is the correct guidelines provision for a case of arson resulting in death.  See United States v. Tocco, 135 F.3d 116 (2d Cir. 1998); United States v. El-Zoubi, 993 F.2d 442 (5th Cir. 1993).  Moreover, the First Circuit, albeit in different contexts, has determined that deaths resulting from felony murder are appropriately sentenced under

7

2A1.1, the guideline applicable to first degree murder.  See United States v. Shea, 211 F.3d 658 (1st Cir. 2000); United States v. Osorio, 191 F.3d 12 (1st Cir. 1999).

Thus, the PSR correctly has determined the offense level to be 43.

**A Departure Is Not Warranted**

The defendant next argues that, even if 2A1.1 applies, the guideline itself provides that, if a defendant does not cause the death intentionally or knowingly, a downward departure may be warranted.  The application notes to which the defendant adverts, however, do not *mandate* a departure, but rather provide that a departure "may" be warranted if the defendant did not cause death intentionally or knowingly.  USSG §2A1.1, comment. (n.2(B)).  See also United States v. Sanchez, 354 F.3d 70 (1st Cir. 2004)(indicating departure is discretionary).  This same commentary, moreover, provides as an example of a situation in which a departure might be warranted a case where a bank robber passes a demand note and the victim teller has a heart attack and dies.  Id.  The commentary further indicates that whether a departure is appropriate should depend on the defendant's state of mind, the degree of risk inherent in the conduct, and the nature of the underlying offense conduct.

A departure on this ground is not even remotely warranted in this case.  Unlike the scenario posited in the guidelines

8

example, where most note-job robbers and most casual observers would not regard the passing of a note as creating any substantial risk of death, here the defendant's conduct plainly gave rise to the very real risk that somebody would die. The defendant involved himself in setting fire to a fully occupied residential building at a time -- 3:00 a.m. -- when one would assume, as proved to be the case, that the occupants were all asleep. Had the defendant been involved in setting fire to an unoccupied building in broad daylight, he would still be guilty of knowingly and intentionally creating a risk that a firefighter or like emergency response personnel would be killed as a result. But here the risk of death that the defendant knowingly and intentionally created was magnified exponentially given the extreme vulnerability of each and every person asleep in the building, including especially a two-month-old baby such as Angelic Duran.

  Accordingly, the departure would be wholly inappropriate simply in light of the facts and circumstances surrounding the crime of conviction. As noted above, however, the evidence shows that the defendant did not confine his fire-setting to this one situation, but rather was very likely responsible for nine fires that all occurred in close proximity, both in place and in time, to the fatal fire.

  The evidence is especially strong that the defendant set the

9

final fire, on June 9, 2003. This fire, again, was set in the early morning hours, at around 3:43 a.m. Like the fatal fire, it was set in the rear porch area of an occupied building. Like the fatal fire, it created a grave risk that people sleeping within, not to mention firefighters, would be killed. The defendant's conduct in this regard is reprehensible. Far from evincing any remorse over his role in a fire that killed two people, the defendant *repeated* the very conduct that had achieved that tragic end. The fact that the defendant engaged in such conduct on June 9 *knowing for a fact* that his conduct could kill others informs his state of mind on April 3 and strongly suggests that, not only was the death of others something the defendant recognized from the start as possible, but it was also a result he was perfectly willing to bring about.

In <u>United States v. Ferranti</u>, 928 F.Supp. 206 (E.D.N.Y. 1996), the court confronted an argument that the same commentary justified a downward departure. In <u>Ferranti</u>, the defendant had owned a clothing store on the ground floor of a three-story building that, on the upper floors, contained four residential apartments. The business was not profitable, and the defendant recruited a friend to burn it. Either the defendant or somebody else set the business aflame at around 11:00 one evening. A firefighter who went inside to look for occupants fell to his death. The district court (Weinstein, J.) was urged to depart

downward. The court declined, stating:

> Neither the circumstances of the particular crime nor the history of punishment for arsons of this type supports a downward departure.
>
> Arson resulting in loss of human life is murder at common law under the felony murder rule and is first degree murder under most of the statutes which divide the crime into degrees. [Cite omitted].
>
>     *  *  *
>
> Arson of an occupied house is "punished severely because, in burning a dwelling, the defendant manifests a contempt for human life." [Citing 3 *Wharton's Criminal Law* 325 (1995)]. While the fire was set in a store, it was directly under two stories of apartments occupied by four families. The staircase to the apartments was next to the store and the defendant must have known the apartments were occupied, especially in light of his own experience as an owner of tenant occupied real estate. The fire was knowingly set at night, when defendant was well aware that tenants would have been asleep or preparing to retire. . . .
>
> Here the facts support a finding of depraved indifference to death of the victim. The arson was particularly malicious. Only through good fortune were the casualties limited to one death. *Even though the defendant may not have specifically intended to kill a tenant or a firefighter, he is not relieved of responsibility for the inherently dangerous nature of the crime.* [Emphasis added; citation omitted].

Ferranti, 928 F.Supp at 214-15.

Judge Weinstein's rationale in Ferranti for rejecting the departure applies with even greater force here, given that the defendant persisted in his conduct even after causing the deaths

of a young mother and her child.

To be sure, in <u>United States v. Carr</u>, 303 F.3d 539 (4th Cir. 2002), the Fourth Circuit remanded a case where an occupant of the building had been killed via an arson and it appeared that the district court may have equated reckless conduct with knowing conduct.  First, the government believes that the defendant's state of mind at the time of the fatal fire here amounted to at least depraved indifference.  Second, this case is readily distinguishable from <u>Ferranti</u> in any event, given the defendant's continued commission of arsons of dwellings after he caused two deaths.

Accordingly, the defendant's request for a downward departure should be denied.

**Career Offender Treatment**

Although somewhat academic given the applicable guidelines sentence of life imprisonment, the defendant argues that his categorization as a career offender overstates his criminal history and the likelihood that he will recidivate.  The government agrees with the PSR, however, that the career offender status does not overstate the defendant's history or the likelihood that he will reoffend.  As the PSR states in rejecting this objection:

> [T]he defendants's criminal record
> demonstrates that he was regularly involved
> in the criminal justice system for the two
> years preceding his commission of the instant

> offense.  Not only was he arrested on
> numerous occasions, he continually violated
> the terms of his probation.  Furthermore,
> upon hearing the jury verdict in this case,
> the defendant reacted in such a manner that a
> taser gun was used to subdue him.

PSR Response to Defendant's Objection 11, PSR at 39.  The only observation the government would add is that the defendant took the occasion of being taken to the cellblock after his violent outburst in court to threaten Special Agent Balos, claiming that "It's not over" and "You'll get yours."

### **The Guideline Sentence Is Reasonable**

Under the facts and circumstances of this case, the guidelines sentence of life is eminently reasonable in light of the sentencing factors set forth at 18 U.S.C. §3553(a).

First, the sentence appropriately accounts for the nature of the offense, in accordance with 18 U.S.C. §3553(a)(1).  This was a terrible crime, with horrendous consequences.  A young mother is dead.  A two-month-old infant is dead.  Family members and friends have had their lives transformed forever by the defendant's conduct, as they have so eloquently told the Court. The defendant's crime is potentially punishable by death, and the defendant may count himself fortunate that he is not facing that ultimate penalty.  The fact that the penalty is available at all demonstrates the gravity of the defendant's crime and the reasonableness of a lesser sentence, even including life in prison.

The characteristics of the defendant likewise warrant the sentence. As stated above, the career offender status is more than warranted. Beyond that, however, the defendant has shown himself willing to continue to put at risk the lives of wholly innocent third parties by persisting in setting fires, even after causing the deaths at issue here.

Next, a life sentence appropriately reflects the seriousness of the offense, is necessary to provide just punishment, and will help to promote respect for the law, in accordance with 18 U.S.C. §3553(a)(2)(A). Any crime that results in the loss of human life is extremely serious, and it is particularly so when brought about as here -- with a fire set in the dead of night with every possibility that people sleeping within would die. The sentence is eminently reasonable as just punishment for a defendant whose actions have caused such a loss of life. And the sentence is necessary to promote respect for the law. As noted above, the spate of fires that can be attributed to the defendant essentially terrorized a whole neighborhood. A sentence of life in prison will demonstrate to that community and to the public at large that crimes of this sort that result in the predictable loss of life will be dealt with severely, as the public has a right to expect.

The sentence will also promote deterrence. 18 U.S.C. §3553(a)(2)(B). It will specifically deter the defendant, who

will not be in a position to begin his conduct anew. Just as importantly, it will send a message to anybody contemplating arson, including especially the nighttime arson of an occupied dwelling, that the consequences will be appropriately harsh.

The sentence will also protect the public from further crimes of the defendant. 18 U.S.C. §3553(a)(2)(C). The defendant was involved in one fire that had tragic consequences. He continued to set other, similar fires that could have had the same tragic consequences. The need to protect the public demands a sentence that will prevent the defendant ever from engaging in such conduct again. The defendant's outburst in court and subsequent threats to a federal agent likewise bespeak an individual from whom society should be protected.

The sentence is the only guidelines sentence and, as such, reflects the range established by the guidelines. 18 U.S.C. §3553(a)(3), (4). While the statute provides for lesser potential punishments, none of them adequately addresses the factors already discussed. In particular, nothing short of a life sentence adequately reflects the seriousness of the defendant's crime of arson resulting in death, and nothing short of life would adequately protect the public from further crimes of the defendant.

The sentence is necessary to promote uniformity in sentencing. 18 U.S.C. §3553(a)6). Notwithstanding the potential

for a downward departure discussed above, the departure is, for the reasons described in <u>Ferranti</u>, inappropriate where a defendant sets fire to an occupied dwelling when the inhabitants are asleep. The conduct implicated in such a crime goes well beyond negligence or recklessness and should receive at least a guidelines sentence of life in the absence of some extraordinary circumstance not present here.

Finally, while the sentence is not necessarily required to enable the defendant to make restitution, 18 U.S.C. §3553(a)(7), it is necessary to give the victims -- the surviving friends and family of Matilda Medina and Angelic Duran -- justice. Letters have been written in the defendant's behalf speaking of how his incarceration has prevented the defendant from being with his own friends and family. The defendant's conduct, however, tore Matilda and Angelic from the lives of those who loved them forever. The same is not true of the defendant, who can still have contact with others through letters, through phone calls, and through visits.

Moreover, unlike the defendant's victims, who did nothing to deserve being harmed at all, much less killed under the horrific circumstances of this case, the defendant brought this result upon himself. When he participated in a fire that had the predictable result that this one did, and when he confirmed his depraved indifference to human life by continuing to set fires to

occupied dwellings in the early morning hours, he forfeited any reasonable claim to rejoin society. All of the statutory factors point to a sentence of life as the only reasonable sentence available.

## CONCLUSION

For the foregoing reasons, the Court should impose the guidelines sentence of life.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/Robert E. Richardson
ROBERT E. RICHARDSON
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I, Robert E. Richardson, hereby certify that this documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 9, 2008.

/s/Robert E. Richardson
ROBERT E. RICHARDSON